UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **LAKERSKO BROWN, et al.,** ) | |
| ) | |
|     **Plaintiffs,** ) | |
| ) | |
| **v.** ) | No. 3:00-0665 |
| ) | JUDGE ECHOLS |
| **TENNESSEE DEPARTMENT OF** ) | |
| **FINANCE AND ADMINISTRATION** ) | |
| **and M.D. GOETZ, Jr., Commissioner,** ) | |
| ) | |
|     **Defendants.** ) | |

## MEMORANDUM

Pending before the Court is Defendants' Motion To Vacate The Agreed Order Approving The Settlement Agreement And To Dismiss The Case (Docket Entry No. 155), to which Plaintiffs filed a Response (Docket Entry No. 175), and Defendants filed a Reply (Docket Entry No. 179). Also pending are Plaintiffs' Motion to Amend the Complaint (Docket Entry No. 173), to which Defendants have not filed a response; Plaintiffs' Motion For Modification Of Settlement Agreement (Docket Entry No. 166), to which Defendants filed a Memorandum in Opposition (Docket Entry No. 172), and Plaintiffs filed a Reply (Docket Entry No. 178); and Plaintiffs' Motion For Injunction (Docket Entry No. 182), to which Defendants filed a response in opposition (Docket Entry No. 187).[1] The Court heard oral argument on these motions on Thursday, August 30, 2007.

---

[1] Plaintiffs' Motion For An Order For Specific Performance For Non-Compliance With Settlement Agreement (Docket Entry No. 183) is also pending, but in a prior Order the Court placed that motion in abeyance. (Docket Entry No. 188, Order.)

1

**A. Background**

On May 1, 2001, the Court certified a class comprised of mentally retarded Tennessee residents who are eligible for Medicaid services through State and privately owned Intermediate Care Facility/Mental Retardation ("ICF/MR") facilities, pursuant to 42 U.S.C. § 1396a, or who are eligible for home-based services through a Home and Community-Based Services ("HCBS") waiver for the mentally retarded, pursuant to 42 U.S.C. § 1396n, and who request services under these programs, but who (1) are denied the opportunity to apply for such services; (2) apply for services under these programs and are denied; or (3) are placed on a waiting list for services under these programs. Following denial of the parties' cross-motions for summary judgment and a fairness hearing, the Court entered an Agreed Order on June 15, 2004, approving a Settlement Agreement ("the Agreement") executed on behalf of the parties.

In the Agreement, the parties verbalized the purpose of their compromise:

> The parties enter into this Agreement recognizing that their overriding common interest is in assuring that Tennessee's citizens with mental retardation are provided reasonable opportunities to grow and develop, exercise independence, and lead full and productive lives in a safe environment. . . . The parties recognize that individuals with mental retardation eligible for ICF/MR level of care have been placed on waiting lists for mental retardation services. This Agreement is intended to eliminate or substantially reduce the waiting list for services by providing for: (1) the development of the mental retardation system infrastructure and provider network capacity necessary to support the expansion of quality home and community based waiver services; (2) access to interim services for Medicaid-eligible individuals seeking services; and (3) an appropriate planning process for the future expansion and/or development of home and community based waiver programs and services for Medicaid-eligible persons with mental retardation on the DMRS[2] waiting list.

(Docket Entry No. 116, Ex. A, Settlement Agreement at 2-3.)

---

[2]"DMRS" refers to the Tennessee Division of Mental Retardation Services.

The parties acknowledged in the Agreement that "defendants cannot fully anticipate the rate of growth of the DMRS waiting list, the amount of legislative appropriations for home and community based MR services, or the maximum number of waiver participants that will be approved by . . . (CMS)[.]" The parties set as a goal, however, "to eliminate or substantially reduce the waiting list for services for Medicaid-eligible persons with mental retardation that meet the ICF/MR level of care criteria." (Id. at 3.)

The State agreed to (1) seek approval from the federal Center for Medicare and Medicaid Services ("CMS") for a new Medicaid self-determination waiver and fund the enrollment of 600 enrollees during the first year after approval and 900 enrollees during the second year; (2) provide $12 million in fiscal years 2003-2004, 2004-2005 and 2005-2006 in HCBS waiver improvement funding; (3) implement a targeted case management program within six months of the approval of the Settlement Agreement; (4) develop a program to provide consumer directed support to individuals on the waiting list in the "crisis," "urgent," or "active" categories who are not receiving family support services, with funding capped at $2,280 per person, not to exceed $5 million per year; (5) make best efforts to achieve relief from the moratorium imposed by CMS in May 2001 on new admissions to the HCBS waiver; and (6) implement a series of reforms to the process for applying for MR services. The Agreement provides that

> defendants' commitment is to: 1) work toward lifting the moratorium on new admissions to the existing home and community based MR waiver program as soon as possible; 2) develop MR service system infrastructure; 3) apply for new waivers so that the DMRS waiting list will move at a reasonable pace; and 4) strive to provide services to Medicaid-eligible persons with mental retardation that meet the ICF/MR level of care criteria on the waiting list with reasonable promptness. It is defendants' intent to reach the goals of this Agreement without reducing the funding for other services to individuals with mental retardation.

Id.

In the three years since the Agreement was entered, it appears that some of the parties' goals have been met while others have not.³ A primary concern identified in the pending motions is the DMRS waiting list. According to Defendants, in 2005 DMRS enrolled from the waiting list 961 individuals into the main HCBS waiver and 361 individuals into the self-determination waiver, for a total of 1,322 enrollments during that year. (Docket Entry No. 170, Norris Decl. ¶ 9.) In 2006, DMRS enrolled from the waiting list 224 individuals in the main HCBS waiver and 481 individuals in the self-determination waiver, for a total of 705 enrollments during that year. Thus, during 2005-2006, DMRS initiated services for 2,027 individuals on the waiting list–1185 in the main HCBS waiver and 842 in the self-determination waiver. (Id.)

Plaintiffs evaluate the numbers from a different perspective. Despite the enrollments noted above, they emphasize the rapid growth of the waiting list between January 2005 and June 2007 to a total of 5,834 individuals. They draw special attention to the total of those persons assigned to the "crisis" category–1,015 as of June 2007. According to the Agreement and Defendants' subsequently-adopted policy, persons in need of MR services who are defined as being in "crisis" are either homeless or threatened with homelessness within thirty days; have suffered the death, incapacitation or loss of a primary caregiver and lack an alternate primary caregiver; or present a serious and imminent danger of harm to self or others. (Agreement at 4; Docket Entry No. 166, Ex. E.) The rise in individuals added to the waiting list, coupled with a precipitous decline in the number of those actually served since early 2006 has resulted in more names on the waiting list than

---

³Compare Declaration of Stephen H. Norris (Docket Entry No. 170) (setting forth the State's recent achievements) with Plaintiffs' pending motion seeking specific performance of the Agreement, alleging the State failed to meet certain of its obligations (Docket Entry No. 183).

4

existed before the Agreement was entered. (Docket Entry No. 195, Supplement to Motion For Modification of Settlement Agreement, Ex. G, June 2007 Monthly Report of Defendants.)

Defendants counter that the Agreement established targets for new enrollments in the self-determination waiver of 600 in the first year and 900 in the second year. The Agreement did not establish target enrollments for the main HCBS waiver. After the State successfully persuaded CMS to lift the moratorium on new enrollments in the HCBS waiver in April 2005, DMRS prioritized the enrollment of individuals with the most severe needs, as contemplated by the Agreement. Most of these "crisis" individuals could not properly be served in the self-determination wavier, which has an annual expense cap of $30,000, so they were enrolled in the costlier main HCBS waiver. Because of the greater expense of enrollments in the HCBS waiver, the State's expenditures on new enrollments in 2005-2006 went far beyond the expected costs of complying with the Agreement's enrollment targets in the self-determination waiver. The total number of enrollments for 2005-2006 (2,027 individuals) significantly surpassed the total enrollment targets imposed by the Agreement (1,500 individuals). Defendants believe they have implemented the specific steps envisioned by the Agreement. (Norris Decl. ¶¶ 2-10.) In 2006 the parties attempted to negotiate and submitted to mediation the question of appropriate expansion and provision of MR services for the third, fourth and fifth years covered by the Agreement, but could not reach an acceptable resolution. The Magistrate Judge declared an impasse and referred the matter to this Court. Defendants conclude that the system for MR services is incapable of incorporating large growth in the number of enrollees while still maintaining the necessary quality of services. The provision of lower quality services could trigger CMS to impose another moratorium on waiver services. Additionally, Defendants are concerned about making a financial commitment to the

5

waiver programs that would negatively impact the State's other financial obligations. Defendants state they are committed to do everything they reasonably can, consistent with other financial obligations, to reduce the waiting list for MR services. The proposed budget the Governor submitted to the General Assembly for FY 2007 included funding that will permit DMRS to expand enrollment by 50 per month during that year.[4] The State promises to maintain this commitment if the Court grants the motion to vacate the Agreement and dismisses the case. (Id. at ¶¶ 12-16.)

In Plaintiffs' view, Defendants' planning failed to heed Plaintiffs' predictions that the waiting list would grow quickly when families who had long given up hope of receiving services learned that waiver enrollments were occurring. Plaintiffs also question Defendants' commitment noting what they say is inadequate state funding earmarked to meet the objectives of the Agreement. Perhaps most troubling is Plaintiffs' allegation that, despite entering into the Agreement, the Defendants unilaterally and secretively took steps to make compliance with the terms of the Agreement impossible. Specifically, Plaintiffs point to Defendants' March 2006 request, approved by CMS, reducing the number of available slots in the HCBS and self-determination waivers by nearly 1,200 beginning in January 1, 2007 and continuing thereafter (Docket Entry No. 175, Exs. B, C, E & F), and Deputy Commissioner Stephen Norris' June 5, 2006 letter to waiver applicants and their families acknowledging the drop in waiver enrollments. (Docket Entry No. 166, Ex. D.) Having accomplished this feat, Plaintiffs suggest it is no wonder that the State budget to fund fiscal year 2007 waiver enrollments also dropped to 50 per month, and even then, the State enrolled fifty persons in only one month after the new level was established. Plaintiffs charge that, instead of

---

[4]The record does not reveal how the General Assembly voted on this portion of the Governor's proposed budget.

6

increasing enrollment into the waiver programs as required by the Agreement, Defendants have insured that persons in need will continue to be denied services.

## B. **Defendants' Motion to Vacate the Agreed Order**

Against this backdrop, Defendants move to vacate the Agreement and dismiss the case in its entirety. The argument is made that, at the time the parties negotiated the Agreement, they mutually labored under a fundamental misunderstanding that the phrase "medical assistance" in the Medicaid statute meant that States must provide qualified individuals with *medical services*, not merely financial reimbursement for such services.

Defendants reason that Plaintiffs' First Amended Complaint alleged the existence of the DMRS waiting list violated 42 U.S.C. § 1396a(a)(8) & (10) in that the State failed to provide services with reasonable promptness and on equal footing with other Medicaid services. Section 1396a(a)(8) (emphasis added) requires that "[a] state plan for *medical assistance* must[] provide that all individuals wishing to make application for *medical assistance* under the plan shall have opportunity to do so, and that *such assistance* shall be furnished with reasonable promptness to all eligible individuals." Section 1396a(a)(10)(B) (emphasis added) requires that "[a] state plan for *medical assistance* must[] provide . . . that the *medical assistance* made available to any individual described in subparagraph (A)-- (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and (ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A)."

According to Defendants, federal courts had widely assumed that the phrase "medical assistance" encompassed the direct provision of medical services by the State. See e.g. Bryson v.

7

Shumway, 308 F.3d 79, 88 (1st Cir. 2002); Doe v. Chiles, 136 F.3d 709, 716 n.13 (11th Cir. 1998); Sobky v. Smoley, 855 F.Supp. 1123, 1147 (E.D. Cal. 1994). Moreover, because courts had held that sections 1396a(a)(8) and (10) applied to the administration of Medicaid waivers, the definition of "medical assistance" had also been applied to the provision of waiver services, at least up to the number of approved available slots within the waiver program. See e.g., Boulet v. Cellucci, 107 F.Supp.2d 61, 77-78 (D. Mass. 2000); Lewis v. New Mexico Dept. of Health, 94 F.Supp. 2d 1217, 1234 (D. N.M. 2000). The only contrary view at the time appeared in dictum in Bruggeman v. Blagojevich, 324 F.3d 906, 910 (7th Cir. 2003), in which a Seventh Circuit panel observed:

> Even if [plaintiffs] did require emergency treatment, their theory of violation would be a considerable stretch because the statutory reference to 'assistance' appears to have reference to *financial* assistance rather than to actual medical *services*, though the distinction was missed in Bryson v. Shumway, 308 F.3d 79, 81, 88-89 (1st Cir. 2002), and Doe v. Chiles, 136 F.3d 709, 714, 717 (11th Cir. 1998). Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals. The regulations that implement the provision indicate that what is required is a prompt determination of eligibility and prompt provision of funds to eligible individuals to enable them to obtain the covered medical services that they need, see 42 C.F.R. §§ 435.911(a), .930(a)-(b); a requirement of prompt *treatment* would amount to a direct regulation of medical services.

Defendants assert the landscape changed when the Sixth Circuit decided Westside Mothers v. Olszewski, 454 F.3d 532 (6th Cir. 2006) ("Westside Mothers II"). In that case, the Sixth Circuit determined that "medical assistance" means states must furnish only "financial assistance" or *payment* for medical services. Id. at 540. In so holding, the court construed 42 U.S.C. § 1396d(a), which defines "medical assistance" as "payment of part or all of the cost of [listed] care and services" for Medicaid-eligible individuals. Id. at 540-541. The court also relied on the regulations implementing the statute, which require only prompt determination of eligibility and prompt payment to eligible individuals to enable them to obtain necessary medical services. 42 C.F.R.

8

§§ 435.911, 435.930. The Tenth Circuit adopted a similar analysis in Mandy R. v. Owens, 464 F.3d 1139, 1143 (10th Cir. 2006), holding that, because the Medicaid statute requires states to provide only prompt and evenhanded payment for medical services, the plaintiffs could not state a legal claim where they asserted they were on a waiting list for services, not on a waiting list for the payment of services.

Likening the Agreed Order adopting the Agreement to a consent decree, Defendants seek vacatur under Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 387 (1992), and Sweeton v. Brown, 27 F.3d 1162, 1166 (6th Cir. 1994), on the grounds that the intervening change in law shattered the foundation upon which the claim for injunctive relief was based; the intervening change reveals that the Agreement was based on a fundamental, mutual mistake about the meaning of governing law; and the change reveals that the Agreement imposes on state officials obligations that no longer bear any close relation to the requirements of federal law. Backed by the holdings of Westside Mothers II and Mandy R that states must provide payment, not medical services, Defendants postulate further that "sections 1396a(8) and (10) impose no duty on the States to <u>ensure the provision</u> of medical *services*." (Docket Entry No. 156, Memorandum in Support at 14 (underlined emphasis added; italics in original.) Ensuring the provision of medical services is an issue that was not decided in Westside Mothers II and was only briefly addressed in Mandy R.

In the latter case, the plaintiffs argued that Colorado's waiver application indicated "a commitment to ensuring that every eligible patient receives services, either from ICFs/MR or HCBS." Mandy R, 464 F.3d at 1145. The Tenth Circuit ruled:

> Although the waiver application suggests that a developmentally disabled person will have a choice between an ICF/MR and HCBS, it does not assign to the State, or any other party, the responsibility to ensure that such facilities are in fact available. Indeed, the waiver application appears to mean only that the choice among 'feasible

9

alternatives' is to be made by the recipient–not that the State must make alternatives available. Because it is at best ambiguous on the point, it provides no reason to reject the natural reading of the statutory definition.

Id. Additionally, the Tenth Circuit observed that the plaintiffs in that case did "not suggest that ICF/MR rates [had] been set so low as to prohibit new entrants to the market . . . [n]or do the plaintiffs claim that the State has discouraged efforts to build HCBS facilities, which is where the greatest shortfall in facilities exists[,] [a]nd the plaintiffs do not claim that the state has denied or effectively denied (through delay or similar means) a formal application to build new ICF/MR facilities." Id.

In this case, however, the facts are different from those in Mandy R. The State's waiver applications submitted to CMS are not at issue here, but rather the jointly executed and binding contractual Agreement in settlement of litigation which placed a specific duty on Defendants to ensure the provision of needed services, even though Defendants were not required by the Agreement itself or now by Westside Mothers II to provide such services themselves. (Agreement at 17 ("The parties intend this Agreement to be a binding contract.") The parties jointly promised that the "Agreement is intended to eliminate or substantially reduce the waiting list for services by providing for: (1) <u>the development of the mental retardation system infrastructure and provider network capacity necessary to support the expansion of quality home and community based waiver services</u>; (2) <u>access to interim services</u> for Medicaid-eligible individuals seeking services; and (3) <u>an appropriate planning process for the future expansion and/or development of home and community based waiver programs and services for Medicaid-eligible persons with mental retardation on the DMRS waiting list</u>." (Docket Entry No. 116, Ex. A, Settlement Agreement at 2-3 (emphasis added).) The Agreement specifically provides further that "defendants' commitment

10

is to . . . <u>develop MR service system infrastructure</u>[.]" <u>Id.</u> at 3. Defendants agreed to improve funding for, and delivery of, needed services. <u>Id.</u> at 5-15. There are no provisions in the Agreement obligating the Defendants to provide medical services directly or making the State a "provider of last resort."

The parties did not make a mutual mistake of law that would justify terminating this Agreement, nor has the law changed to such an extent that all of the provisions of the Agreement now impose a higher burden on the state Defendants than federal law requires. In settling the underlying litigation, Defendants willingly accepted a contractual duty to ensure the provision of medical services to persons on the DMRS waiting list to help accomplish the parties' "overriding common interest" in "assuring that Tennessee's citizens with mental retardation are provided reasonable opportunities to grow and develop, exercise independence, and lead full and productive lives in a safe environment."[5] (Agreement at 2.) Neither <u>Rufo</u>, <u>Sweeton</u>, <u>Westside Mothers II</u> nor

---

[5]Title 42 U.S.C. § 1396a(a)(30) provides in part that states must

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]

Although the Sixth Circuit held that § 1396a(a)(30) does not confer on Medicaid recipients a private right of action under §1983, <u>Westside Mothers II</u>, 454 F.3d at 542, the statute prescribes the law the states must follow to ensure that enough service providers are available, and the Defendants accepted their responsibility to follow this law and improve the Tennessee provider network when they executed the Agreement. <u>See</u> <u>also</u> 42 U.S.C. § 1396a(a)(9) (requiring states to establish and maintain health standards for private and public institutions in which recipients of medical assistance receive care or services; 42 U.S.C. § 1396n(c)(2) (requiring states to assure necessary safeguards to protect health and welfare of individuals provided services under HCBS waiver and to assure financial accountability for funds expended with respect to such services). The federal government retains authority to withhold payment of federal Medicaid funds to any state that changes its plan

11

Mandy R requires the Court to relieve the Defendants of the solemn obligations they voluntarily assumed under the Agreement. Defendants' motion to vacate the Agreement and dismiss the case will be denied.

## C. Plaintiffs' Motion To Amend the Complaint

In the event the Court were inclined to grant Defendants' motion to vacate the Agreement and dismiss the case, Plaintiffs filed an alternative motion to amend the complaint. Because the Court will deny Defendants' motion to vacate, the Court will also deny Plaintiffs' motion to amend the complaint.

## D. Plaintiffs' Motion For Modification of Settlement Agreement

In light of the growing number of individuals on the DMRS waiting list and Defendants' actions in reducing the number of available waiver enrollment slots, Plaintiffs seek modification of the Agreement to require the Defendants by the end of calendar year 2007 to enroll into waiver services all individuals on the waiting list who have been designated in the "crisis" category for more than ninety (90) days. Plaintiffs claim that the pace of enrollment since May 2006 is contrary to the commitment made by the Defendants in the Agreement and the parties' goal to substantially reduce or eliminate the waiting list by the end of year five. Plaintiffs ask the Court to presume that individuals in the "crisis" category face irreparable harm because, by definition, such persons are either homeless, without an adequate primary caretaker, or present a serious risk of danger to self or others. Plaintiffs observe that, once a state elects to provide an optional service, that service becomes part of the state's Medicaid plan and the state is obligated to provide that service in compliance with the requirements of federal law, citing 42 U.S.C. § 1396a(a)(8); 42 C.F.R.

---

to such a degree that it no longer complies with the provisions of § 1396a or in the administration of the plan there is a failure to comply substantially with any provision of § 1396a.

12

§§ 435.911(a), 435.930; Alexander v. Choate, 469 U.S. 287, 289 n.1 (1985), Weaver v. Reagan, 886 F.2d 194, 197 (8th Cir. 1989), and Doe v. Chiles, 136 F.3d 709, 719 (11th Cir. 1998).

The Agreement provides: "[I]n the event that it appears that the plaintiff class is threatened with irreparable harm, the plaintiffs may apply for a modification of this agreement, and its implementing order, as necessary to prevent such harm, so long as such modification remains consistent with federal law, the intent of this agreement and its implementing orders, and the applicable standards for modification of such an agreement ordered by the Court." (Agreement at 18.) Plaintiffs' motion to modify is governed by Federal Rule of Civil Procedure 60(b). Rufo, 502 U.S. at 378. "'[S]ound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.'" Id, at 380 (quoted case omitted). Plaintiffs bear the burden to establish that "a significant change in circumstances warrants revision" of the Agreement. Id. at 383. If Plaintiffs meet this standard, the Court "should consider whether the proposed modification is suitably tailored to the changed circumstance." Id.

The increase in the number of individuals, particularly those in the "crisis" category, on the DMRS waiting list and Defendants' actions in reducing the number of available waiver enrollment slots with CMS approval are troubling to the Court. As the parties recognize, the goal of this Agreement was to substantially reduce or eliminate the entire waiting list within five years. Contrary to initial expectations, however, the waiting list is growing substantially despite the State's enrollment of hundreds of people into waiver services since the Agreed Order was entered. The Court believes that the monthly reports provided by the Plaintiffs in support of their motion to modify establish a significant change in circumstances that may warrant revision of the Agreement.

13

The Court is not convinced, however, that Plaintiffs' proposed remedy is suitably tailored to the changed circumstance. The most recent information presented by the Plaintiffs, which is the June 2007 monthly report (Docket Entry No. 195, Ex. G), does not indicate how many of the 1,015 persons then included in the "crisis" category had maintained that status for more than 90 days, nor does the Court have any information about how the composition of the "crisis" category waiting list has changed since June 2007. Thus, the Court does not know how many individuals Plaintiffs propose should be mandated into waiver enrollments by the end of the calendar year. The Court surmises that the total number of "crisis" applicants who have waited more than 90 days for enrollment likely surpasses the rate of 50 enrollments per month under which the Defendants are currently operating.

The General Assembly has already determined for fiscal year 2007 the appropriation necessary to pay for waiver enrollments, based on information provided by the Defendants. State budgeting decisions are uniquely within the province of the Governor and the General Assembly. This Court does not sit as a super-legislature to direct the State of Tennessee in the method it should use to set its funding priorities. Such policy matters are exclusively for elected state officials to decide.

Additionally, Plaintiffs present no evidence that the Medicaid services system infrastructure can absorb by the end of the year the number of waiver enrollments Plaintiffs propose. Even if the CMS-approved cap of 50 slots per month could be disregarded (and the Court does not indicate that it legally could be), Plaintiffs present no evidence that sufficient facilities exist to provide necessary waiver services to these individuals who have wide-ranging and divergent needs, or that the quality of services provided would not suffer due to the unexpected influx of clients. Plaintiffs criticize

14

Deputy Commissioner Norris for stating at his deposition that he did not know what the provider network could withstand and that he often proceeds based on instinct and anecdotal evidence. Yet, Plaintiffs have not presented any evidence in support of the motion to modify showing that the provider network can accommodate Plaintiffs' proposal. The Court must make its findings and conclusions based on the facts and the applicable law, not speculation.

One primary and achieved goal of the parties' Agreement was convincing CMS to lift the moratorium it had placed on Tennessee's waiver services due to quality concerns. In accordance with the Agreement, the Defendants expended much time, effort and funding to persuade CMS to lift the moratorium. The Court would be ill-advised to modify the Agreement on the scant factual record before it to command that Defendants enroll an unspecified number of individuals into waiver services by the end of the year without also giving adequate consideration to the possibility that doing so might prompt CMS to impose a new moratorium that would harm all individuals on the waiting list.

In the Agreement the parties recognized the impediment presented by the earlier CMS moratorium and noted the limitations on enrollment slots available. The Agreement acknowledged that the pace of enrollments would be limited by legislative funding decisions beyond the Defendants' control. Granted, Defendants have since obtained a reduction, not an increase, in available slots, and the allegedly surreptitious manner in which Defendants accomplished that reduction, if true, is disheartening to the Court in light of all the efforts made to encourage openness and conciliation of the parties to achieve the greater good of the developmentally disabled.

Even assuming that Plaintiffs' proposed modification remains consistent with federal law and the intent of the Settlement Agreement and its implementing orders, nonetheless, there is no

evidence before the Court to establish that Plaintiffs' proposal is suitably tailored to meet the challenges of a growing waiting list and declining enrollment availability. Plaintiffs' motion will be denied.

**E.  Plaintiffs' Motion for Injunction**

Plaintiffs seek an injunction to prohibit Defendants from further divulging the substance of the parties' discussions and positions taken during confidential settlement negotiations. Plaintiffs allege that Deputy Commissioner Norris disclosed the Plaintiffs' settlement position while testifying before a committee of the General Assembly during a public hearing.

Plaintiffs are entitled to a permanent injunction only if they can show they have suffered an irreparable injury, that remedies available at law are inadequate to compensate for that injury, that considering the balance of hardships between the Plaintiffs and the Defendants a remedy in equity is warranted, and that the public interest would be served by a permanent injunction. See eBay Inc. v. MercExchange, L.L.C., — U.S. —, 126 S.Ct. 1837, 1839 (2006). Plaintiffs have not carried their burden to meet these requirements.

Deputy Commissioner Norris, as a state official, has an obligation to provide truthful testimony to the General Assembly which is charged with funding the Department's programs and its compromises to disputes such as this one. Plaintiffs have not shown irreparable harm as a result of his disclosure, nor have Plaintiffs established that the situation may arise again in the future. Plaintiffs' interest in keeping their settlement position private does not outweigh the hardship faced by the legislature if it is denied information critical to its decisions. Plaintiffs also have not shown that they lack adequate remedies at law, or that the public interest in this lawsuit or in thorough

16

communications between the executive and legislative branches of government would be served by a permanent injunction. This motion will be denied.

## F. The Next Step

In light of these rulings, the Court will next proceed to consider Plaintiffs' Motion For An Order For Specific Performance For Non-Compliance With Settlement Agreement (Docket Entry No. 183), which the Court held in abeyance by previous Order. Plaintiffs may reconsider the content of their motion filed on May 9, 2007, and file an amended or supplemented motion as desired. The Court will allow the parties a limited period to conduct discovery. Defendants will then have an opportunity to respond to the amended or supplemented motion, and Plaintiffs will be permitted to file a reply. The Court will then hold a hearing before resolving the motion.

## G. Conclusion

For all of the reasons stated, Defendants' Motion To Vacate The Agreed Order Approving The Settlement Agreement And To Dismiss The Case (Docket Entry No. 155), will be denied, as will Plaintiffs' Motion to Amend the Complaint (Docket Entry No. 173), Plaintiffs' Motion For Modification Of Settlement Agreement (Docket Entry No. 166), and Plaintiffs' Motion For Injunction (Docket Entry No. 182). The Court will schedule discovery, briefing, and a hearing on Plaintiff's Motion For An Order For Specific Performance For Non-Compliance With Settlement Agreement (Docket Entry No. 183), as it may be amended or supplemented.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE