**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **LAKERSKO BROWN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 3:00-0665** |
| ) | **JUDGE ECHOLS** |
| **TENNESSEE DEPARTMENT OF** ) | |
| **FINANCE AND ADMINISTRATION** ) | |
| **and M.D. GOETZ, Jr., Commissioner,** ) | |
| ) | |
| **Defendants.** ) | |

### MEMORANDUM

Pending before the Court is Plaintiffs' Second Amended Motion For An Order For Specific Performance For Non-Compliance With Settlement Agreement (Docket Entry No. 218), to which Defendants filed a response in opposition (Docket Entry No. 230) and Plaintiffs filed a reply (Docket Entry No. 232). The Court heard oral argument on the motion on January 23, 2008.

### I. PROCEDURAL HISTORY

On May 1, 2001, the Court certified a class comprised of mentally retarded Tennessee residents who are eligible for Medicaid services through State and privately owned Intermediate Care Facility/Mental Retardation ("ICF/MR") facilities, pursuant to 42 U.S.C. § 1396a, or who are eligible for home-based services through a Home and Community-Based Services ("HCBS") waiver for the mentally retarded, pursuant to 42 U.S.C. § 1396n, and who request services under these programs, but who (1) are denied the opportunity to apply for such services; (2) apply for services under these programs and are denied; or (3) are placed on a waiting list for services under these programs. Following denial of the parties' cross-motions for summary judgment and a fairness hearing, the Court entered an Agreed Order on June 15, 2004, approving a Settlement Agreement ("the Agreement") executed by the parties.

In the Agreement, the parties verbalized the purpose of their compromise:

> The parties enter into this Agreement recognizing that their overriding common interest is in assuring that Tennessee's citizens with mental retardation are provided reasonable opportunities to grow and develop, exercise independence, and lead full and productive lives in a safe environment. . . . The parties recognize that individuals with mental retardation eligible for ICF/MR level of care have been placed on waiting lists for mental retardation services. This Agreement is intended to eliminate or substantially reduce the waiting list for services by providing for: (1) the development of the mental retardation system infrastructure and provider network capacity necessary to support the expansion of quality home and community based waiver services; (2) access to interim services for Medicaid-eligible individuals seeking services; and (3) an appropriate planning process for the future expansion and/or development of home and community based waiver programs and services for Medicaid-eligible persons with mental retardation on the DMRS[1] waiting list.

(Docket Entry No. 218-1, Ex. A, Settlement Agreement at 2-3.)

The parties acknowledged in the Agreement that "defendants cannot fully anticipate the rate of growth of the DMRS waiting list, the amount of legislative appropriations for home and community based MR services, or the maximum number of waiver participants that will be approved by . . . (CMS)[.]"[2] The parties set as a goal, however, "to eliminate or substantially reduce the waiting list for services for Medicaid-eligible persons with mental retardation that meet the ICF/MR level of care criteria." (Id. at 3.)

The State agreed to (1) seek approval from CMS for a new Medicaid Self-Determination Waiver[3] ("SD waiver") and fund the enrollment of 600 enrollees during the first year after approval

---

[1]"DMRS" refers to the Tennessee Division of Mental Retardation Services.

[2]"CMS" refers to the federal Center for Medicare and Medicaid Services.

[3]The Self-Determination Waiver "affords participants the opportunity – based on individual preference and the willingness to assume the responsibilities that accompany self-determination – to lead the person-centered planning process and directly manage certain services, including the recruitment and management of service providers." (Docket Entry No. 220-1, DMRS Policy #04.300.10.13 at 2.)

2

and 900 enrollees during the second year; (2) provide $12 million in each of fiscal years 2003-2004, 2004-2005 and 2005-2006 in HCBS waiver improvement funding; (3) implement a targeted case management program within six months of the approval of the Settlement Agreement; (4) develop a program to provide consumer directed support to individuals on the waiting list in the "crisis," "urgent," or "active" categories who are not receiving family support services, with funding capped at $2,280.00 per person, not to exceed $5 million per year; (5) make best efforts to achieve relief from the moratorium imposed by CMS in May 2001 on new admissions to the HCBS waiver; and (6) implement a series of reforms to the process for applying for MR services. The Agreement provides that:

> defendants' commitment is to: 1) work toward lifting the moratorium on new admissions to the existing home and community based MR waiver program as soon as possible; 2) develop MR service system infrastructure; 3) apply for new waivers so that the DMRS waiting list will move at a reasonable pace; and 4) strive to provide services to Medicaid-eligible persons with mental retardation that meet the ICF/MR level of care criteria on the waiting list with reasonable promptness. It is defendants' intent to reach the goals of this Agreement without reducing the funding for other services to individuals with mental retardation.

Id.

Defendants met or exceeded some of these goals, most notably achieving the removal of the moratorium on new admissions to the HCBS waiver, receiving the approval for the new SD waiver, and enrolling over 2,200, rather than 1,500, individuals in the waivers during the first two years of the Agreement.[4] At the time the Agreement was approved by the Court in June 2004, there were approximately 3,200 individuals on the DMRS waiting list. (Docket Entry No. 228-1, Oct. 29, 2007 Norris Depo. at 91.) By August 2007, the statewide DMRS waiting list had grown to 6,032, and of those, 1,091 persons were included in the "crisis" category. (Docket Entry No. 218-5 Ex. E, Aug.

---

[4]By August 2007, a total of 2,405 individuals had been enrolled in the SD waiver (981) and the HCBS waiver (1,424).

2007 Brown Data Report.)  An individual in need of MR services is considered to be in "crisis" if that person is either homeless or threatened with homelessness within thirty days; has suffered the death, incapacitation or loss of a primary caregiver and lacks an alternate primary caregiver; or presents a serious and imminent danger of harm to self or others.  (Agreement at 4.)  Also, as of August 2007, of the 6,032 persons on the waiting list, 473 individuals were placed in the "urgent" category.  (Ex. E, Aug. 2007 Report.)  "Urgent" means the individual "needs services soon and meets one or more of the following criteria: (1) aging or failing health of caregiver and no alternate caregiver is available to provide supports; (2) living situation presents a significant probability of abuse or neglect; (3) increasing risk of aggressive or assaultive behavior toward self or others; (4) stability of current living situation is severely threatened due to extensive support needs or family catastrophe; or (5) discharge from other service system (including but not limited to: school, DCS, RMHI, Forensics) is imminent."  (Agreement at 5.)  Thus, as of August 2007, there were a total of 1,564 "crisis" and "urgent" cases awaiting enrollment in MR services.  Of the 6,032 on the waiting list in August 2007, 3,158 persons were included in the "active" category.  (Ex. E, August 2007 Report.)  The term "active" defines "a category of need which means the person and/or conservator/guardian is requesting services as of now but does not have the intensive needs which meet the criteria for "crisis" or "urgent."[5]  (Agreement at 5.)

The parties attempted to negotiate and submitted to mediation the question of appropriate expansion and provision of MR services for the third, fourth and fifth years covered by the Agreement, but they could not reach an acceptable resolution.  The Magistrate Judge declared an impasse and referred the matter to this Court. Thereafter, Defendants sought to vacate the

_____

[5]In year two, fiscal year 2005-2006, DMRS determined that nearly half of the individuals on the waiting list then were between the ages of 0-22, or "school-aged."  (Docket Entry No. 218-3.)

4

Agreement, and the Court denied that request. (Docket Entry Nos. 199-200, Memorandum and Order.) The Court's decision refusing to vacate the Agreement is currently on appeal to the Sixth Circuit.

## II.  PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

Now before the Court is Plaintiffs' motion to enforce provisions of the Agreement relating to years one and two. Plaintiffs contend that Defendants failed to satisfy the terms of the Agreement in three ways: (1) Defendants failed to spend $5 million per year on consumer directed support ("CDS funds") in violation of Section VI. C. of the Agreement; (2) Defendants failed to spend $500,000.00 per month for interim support services in the nine (9) months between July 2004 and April 2005, in violation of Section VI. D. of the Agreement; and (3) Defendants failed to implement measures to address community infrastructure needs, including provider network capacity, in order to substantially reduce the waiting list or eliminate it entirely, as contemplated by the Agreement. The Court will summarize the parties' positions on each issue in turn.

### A.  Consumer Directed Support

Section VI. of the Agreement is entitled "Program Improvements." Paragraph "C." of Section VI. provides:

> Within three months following the approval of this agreement or July 1, 2004, whichever is later, defendants will develop a program to provide consumer directed support to each individual who is on the waiting list in the crisis, urgent or active category but not currently receiving family support services. Beginning July 1, 2004, consumer directed support will be capped at an amount of $2280 per person per year not to exceed a total fiscal year annual expenditure of more than $5 million. Enrollment will be phased in throughout the year.

This Court approved the Agreement on June 15, 2004. Three months after the approval date, September 15, 2004, was later than July 1, 2004. Therefore, Defendants were obligated to develop

5

by September 15, 2004 a program to provide CDS funds to individuals who were on the waiting list in the crisis, urgent or active categories, but not then receiving family support services.

In conjunction with Section VI.C. of the Agreement, DMRS adopted Policy #: 04.300.10.13, effective July 1, 2004 and revised October 21, 2004. This policy states that its purpose is to "ensure compliance with the <u>Brown</u> Lawsuit and to meet the needs of the individuals on the DMRS Waiver Waiting List[.]" (Docket Entry No. 220-1, Ex. L at 1.) The policy further states that "DMRS has established a statewide-standardized process for the utilization of Consumer Directed Supports." (<u>Id.</u>) The policy defines consumer directed supports as "[s]ervices, equipment or supplies not otherwise available to the individual through the Medicaid State Plan or other community resources that address an identified need, including those that improve and maintain the individual's opportunities for full membership in the community." (<u>Id.</u>)

Applicants for CDS funds were required to meet certain other eligibility requirements in addition to satisfying the criteria of the "crisis," "urgent" or "active" categories of the waiting list. (<u>Id.</u> at 3 C.) Also, services requested by applicants were required to (1) likely prevent the need for emergency or crisis services; (2) decrease the need for other services; (3) promote inclusion in the community; or (4) increase the individual's safety or welfare. (<u>Id.</u> at 2, VI.A.) CDS funds could be used for, but were not limited to, respite care, personal assistance, day care, home modifications, vehicular modifications, communication/adaptive equipment and repair/maintenance, health care supplies, transportation, health related services, nursing, family counseling, recreational activities, evaluation, behavioral supports, and training. (<u>Id.</u> at 2-3, VI. B.)

The policy also stated:

D.    The Regional Office case managers **must** follow the procedures
outlined below for accessing Consumer Directed Supports:

D.1.     Beginning July 1 of each fiscal year, DMRS will identify all current
         individuals on the DMRS Waiver Waiting List who are eligible to
         receive Consumer Directed Supports.  DMRS will then distribute
         $4,500,000 of the state's total fiscal year obligation of $5,000,000 to
         all identified individuals, ensuring no single individual receives more
         than $2280.  The Regional Office case managers may authorize
         payment for any service, supply or piece of equipment that meets the
         established criteria up to the maximum allotted for each person.

D.2.     The Regional Office case managers may request payment for
         Consumer Directed Supports from the State's reserve funds of
         $500,000 if the following criteria are met:

         a.      The individual was determined eligible and received
                 certain approved funds for Consumer Directed
                 Supports on July 1 of the current fiscal year and now
                 has additional needs that exceed or will exceed the
                 amount of funds received; or

         b.      The individual was placed on the DMRS Waiver
                 Waiting List after July 1 of the current fiscal year; and

         c.      The requested service, equipment or supply will likely
                 prevent the need for emergency or crisis services; and

         d.      The individual's total fiscal year allotted funds will
                 not exceed $2280.

(Id. at 3 (emphasis in original).)   Although the Agreement did not specifically call for it, the DMRS

policy on CDS funds provided that $500,000.00 of the $5 million yearly appropriation would be held

in reserve to ensure that some CDS funds would remain for those applicants who applied late in the

fiscal year.  All requests for reserve funds were required to be submitted to the Central Office for

review and approval.  Significant to the pending motion is paragraph E. of Section VI. of the policy,

which provides:

         Within no more than ninety (90) days prior to the end of the fiscal year, all unused
         and unencumbered funds will be redistributed on a first come first served basis to all
         eligible individuals using the criteria set forth in section IV.A.

(Id. at 4.)

7

Plaintiffs contend that Defendants did not comply with the Agreement in the disbursement of CDS funds. In the first year of the Agreement, fiscal year 2004-2005, Defendants spent a total of $2,456,975.00 in CDS funds. (Docket Entry No. 218-2, Ex. B, Annual Report for FY 2005.) This means that Defendants spent less than half of the amount for consumer directed support contemplated by the Agreement for that fiscal year. In the second year of the Agreement, fiscal year 2005-2006, Defendants spent a total of $3,899,727.00 in CDS funds or about seventy-eight percent (78%) of the amount contemplated by the Agreement.

Plaintiffs ask the Court to order specific enforcement of the Agreement and require Defendants to pay a prorated amount of the total deficiency from the first two years ($3,643,398.00) in addition to the $5 million in CDS funds earmarked for each remaining fiscal year of the Agreement, 2007-2008, 2008-2009, and 2009-2010. In other words, the total amount available for CDS funds should be increased in each of the three remaining fiscal years of the Agreement (one of which, year three, is nearing its end in July 2008) to a total of $6,214,466.00 per year ($5 million plus $1,214,466.00 (one-third of the total amount not paid out in years one and two)).

Additionally, Plaintiffs ask the Court to order that, during the ninety-day period prior to the end of each fiscal year remaining in the Agreement, a DMRS case manager will verbally explain the availability of CDS funds to each class member in the crisis, urgent or active categories and/or his or her legal representative. Plaintiffs also ask that such explanation include information about the difference between CDS funds and family support funds and the requirement for choosing one or the other. Further, Plaintiffs ask the Court to require that, after a case manager has provided this explanation, the case manager provide a form for the class member or his or her legal representative to complete and sign in order to indicate a choice between CDS funds and family support funds. Plaintiffs also ask that the Court direct that Defendants provide the completed forms to Plaintiffs'

counsel for review and monitoring purposes.  Finally, Plaintiffs ask that, within the thirty (30) day period after the beginning of each fiscal year remaining in the Agreement, a DMRS case manager provide an invoice to all class members who chose to receive CDS funds and verbally explain how to complete that invoice in order to receive timely payment.

Plaintiffs propose these measures because they say Defendants failed to identify persons eligible to receive CDS funds in years one and two, Defendants failed to explain clearly to individuals on the waiting list during those years how to apply for CDS funds, Defendants did a poor job of publicizing the availability of CDS funds, particularly the availability of funds from the $500,000.00 reserve held until the last 90 days of each fiscal year, Defendants had technical problems processing invoices for those who did apply, and Defendants did not give an adequate explanation to Plaintiffs as to how the unexpended CDS funds appropriated for the first and second years were ultimately disbursed.

Plaintiffs produce two declarations of parents whose children are on the DMRS waiting list. Penny Carter attests that her son eventually received CDS funds after her initial difficulty in obtaining the funds, and the case manager did not tell her about the availability of reserve funds. Ms. Carter learned about CDS reserve funds only when she attended a regional meeting.  She requested the funds thereafter, but she does not reveal whether her application was approved. (Docket Entry No. 232, Ex. B, Carter Decl.)

Brenda Marcellino attests that she, also, had difficulty in obtaining CDS funds for her son after they moved to Tennessee from Florida in October 2006.  The first case manager did not provide information about the funds, and Ms. Marcellino first learned about the funds from her son's second case manager sometime during 2007.  When Ms. Marcellino contacted the second case manager to request additional services, he did not return her calls.  Next, Ms. Marcellino contacted a DMRS

9

regional supervisor on November 29, 2007, who informed her that if she placed her son in a residential setting he would receive more services. Ms. Marcellino replied that she did not wish to place her son in a residential setting. At that time the supervisor informed Ms. Marcellino of the CDS funds and assigned a third case manager, who informed Ms. Marcellino that her son might be eligible for reserve funds. When Ms. Marcellino asked if everyone on the waiting list was notified by DMRS about the reserve funds, he said "no." He explained that "this is discretionary and that only those who call in will receive reserve funds." (Docket Entry No. 232, Ex. C, Marcellino Decl.)

Such difficulties in obtaining CDS funds can be traced, Plaintiffs suggest, to Defendants' failure to explain clearly to members of the class how to apply for these funds early in year one, fiscal year 2004-2005.[6] On August 5, 2004, Stephen Norris, Deputy Commissioner, Division of Mental Retardation Services, wrote a memorandum to individuals then on the waiting list explaining the consumer directed support program, the amount of funds that would be available during the fiscal year, and the process by which the funds would be distributed. (Docket Entry No. 220-5, Norris Memorandum.) Plaintiffs fault Commissioner Norris for failing to include "instructions regarding steps that need to be taken to apply for these funds or any explanation that plaintiffs had a right to enroll at that time." (Docket Entry No. 223, Memorandum at 4.)

The Court notes, however, that Commissioner Norris' memorandum informed eligible plaintiffs that the consumer directed support program was part of the settlement in the Brown lawsuit and would be "phased in over the next year beginning September 17, 2004." (Docket Entry No. 220-5 at 1.) This beginning date of the program coincided with the expiration of the 90 days after

---

[6]It is not clear to the Court how notification about CDS funds in 2004 or 2005 would have assisted Ms. Marcellino, who did not contact Tennessee about services for her son until October 2006, just before her move from Florida.

the Court's approval of the Agreement as stated in Section VI.C. of the Agreement. Further, in his memorandum Commissioner Norris listed Plaintiffs' counsel at that time, Mr. Gary Housepian, as the first contact person to call with any questions about the settlement. He also gave toll-free telephone contact information for Paula McHenry in the DMRS Central Office and similar contact information for the local regional offices in West, Middle, and East Tennessee. Recipients of the memorandum were encouraged to call these individuals with any questions. (Id.)

On February 16, 2005, Commissioner Norris sent out a follow-up memorandum to individuals on the waiting list and repeated the information he included in his earlier August 2004 memorandum. He also stated that, as part of the phase-in of the program, case managers in each grand region were working with individuals on the waiting list to let them know about the program and whether or not a particular individual was eligible. He explained that individuals receiving his memorandum may be eligible to receive funds through consumer directed support. He explained that each person would have a case manager to assist them in accessing the funds, and he listed the types of services that would be covered. Commissioner Norris listed names, titles, and telephone numbers for contacts in each grand region and asked recipients of the memorandum to contact their local regional offices to confirm their eligibility. He also stated that such funds had to be accessed no later than June 30, 2005. (Docket Entry No. 220-6, Norris Memorandum.)

Again on June 10, 2005, Larry Latham, Assistant Commissioner, Community and Facility Services of DMRS, sent a memorandum to individuals on the waiting list notifying them of the availability of consumer directed support funds in year two of the Agreement, fiscal year 2005-2006. (Docket 221-1, Ex. R, Latham Memorandum.) He explained that the consumer directed support program and the family support program both utilized state funds only and therefore, individuals could be approved for funds under one program only. He estimated that each eligible person on the

11

waiting list would be entitled to $1,623.00 in CDS funds[7] and the Family Support Coordinator could explain upon request how much funding might be available to an individual under that program. Latham included much of the same information Norris had included in his prior memoranda, and Latham asked the reader to contact a person named in the memorandum to make a choice between the two funds for the upcoming fiscal year. Latham stated that if "**we do not hear from you, we will consider that you have chosen Family Support funds**." (Id. at 2 (emphasis in original).)

On July 11, 2005, after the fiscal year began, Commissioner Norris sent out another memorandum to individuals on the waiting list containing much of the same information and increasing the per-person amount available to $1,852.00 for fiscal year 2005-2006. (Docket Entry No. 221-2, Ex. S, Norris Memorandum.) He again included contact information for each grand region and the DMRS central office. On January 24, 2006, Latham sent out another memorandum, reminding readers that they may be eligible for CDS funds during the fiscal year and that such funds had to be accessed by June 30, 2006. (Docket Entry No. 221-3, Ex. T, Latham Memorandum.)

Defendants counter that they followed the terms of the Agreement in formulating and implementing the consumer directed support program, the General Assembly appropriated $5 million for the consumer directed support program in each of the first two years of the Agreement, and DMRS made aggressive attempts through mail, town hall meetings, and case manager contacts to notify potentially eligible persons of the availability of CDS funds. Defendants also contend that they enlisted the help of Tennessee's MR advocate community to inform individuals on the waiting list about the CDS funds. Defendants state that DMRS expanded the infrastructure of each regional

---

[7]This figure was obtained by dividing the $5 million appropriated by the total number of individuals on the waiting list in the "crisis," "urgent," and "active" categories. (Docket Entry No. 228-1, Norris Depo. at 10.)

office to process registrations and requests for assistance, as well as provide case management to every person on the DMRS waiting list. Defendants contend that the Agreement capped the amount payable to each eligible person at $2,280.00, and consequently, the large number of individuals on the waiting list required proration of the available funds so that in each fiscal year the amount available to each individual was $2,280.00 or less. Because eligible participants did not apply for CDS funds available to them, Defendants claim they could not pay out all of the appropriated $5 million. Finally, Defendants point out that Plaintiffs never suggested in the first two years of the Agreement that Defendants' outreach efforts were inadequate. Indeed, Plaintiffs' counsel played an integral role in the communications effort.

Commissioner Norris avers in a declaration that during both years, "to the best of [his] knowledge, no individual on the Waiting List was denied reimbursement for any qualifying supplies, equipment, or services up to the individual maximum." (Docket Entry No. 231, Norris Decl. ¶¶ 12, 15.) However, he acknowledged in his October 29, 2007 deposition that the unexpended CDS funds were used at the end of the fiscal year to "close the books on the agency"; in other words, on the last day of the fiscal year the funds were moved to other line items in the agency's budget to balance the books for the fiscal year, and the CDS funds were not carried over into the next fiscal year. (Docket Entry No. 228-1 at 19, Norris Depo.) DMRS received supplemental appropriations from the legislature in fiscal years 2004-2005 and 2005-2006. These supplemental appropriations were needed to cover budgetary overages caused by enrolling more individuals from the waiting list than required by the Agreement or anticipated in the budget and to pay for a much higher percentage than anticipated that was enrolled in the existing and more expensive HCBS waiver. (Docket Entry No. 231, Norris Decl. ¶¶ 12-17.) The existence of these supplemental appropriations ($21.5 million in fiscal 2004-2005 and $56.9 million in fiscal 2005-2006) led Commissioner Norris to conclude that

13

CDS funds did not revert to the state's general fund at the end of the fiscal year, but rather, "each spare dollar that we had at the end of the fiscal year did, in fact, go to community services." (Docket Entry No. 228-1 at 21-27, Norris Depo.) He avers in a declaration that the $21.5 million budget shortfall for Community Services in fiscal year 2004-2005 was net of the budget savings resulting from the fact that the State spent only $2.457 million of the $5 million budgeted for the CDS program. He further avers that the $52 million overage in fiscal year 2005-2006 was net of the budget savings resulting from the fact that the State spent $3.9 million of the $5 million budgeted for the CDS program. As a result, the savings from the CDS program in years one and two were effectively utilized to enroll additional individuals from the waiting list. (Docket Entry No. 231, Norris Decl. ¶¶ 14-17.) Commissioner Norris also attests that any invoicing payment issues were resolved and did not impact the services provided to any individual on the waiting list. (Id. ¶ 18.)

According to Commissioner Norris, the addition of more than 2,200 enrollees from the waiting list over two fiscal years had an enormous impact on DMRS' Community Services program. In July 2004, the HCBS waiver served a total of 4,370 enrollees and the SD waiver did not yet exist. By the end of fiscal year 2006, a total of 6,806 persons were enrolled in the two waivers, an increase of 2,436. Thus, the program grew by over fifty-five percent (55%) during those two years, with the vast majority of the growth due to the enrollment of individuals from the waiting list. DMRS' success in recruiting additional providers has enabled the program to accommodate such a large influx of new enrollees. Despite these efforts, the waiting list continues to increase. (Id. ¶¶ 26-27.)

Thus, it appears DMRS admits that the CDS funds remaining at the end of fiscal years 2004-2005 and 2005-2006 were not spent specifically on services to eligible persons on the waiting list as contemplated by the Agreement. Rather, the CDS funds were used generally to meet DMRS' community services budget needs for persons receiving waiver services.

In reply Plaintiffs respond that the sheer size of the total of unexpended CDS funds in years

one and two–$3,643,398.00–shows that Defendants did not make a concerted, good-faith effort to

identify and disburse the CDS funds to the members of the class for whom the funds were intended.

Plaintiffs emphasize that DMRS' admission that it spent CDS funds to provide services to people

enrolled in waivers establishes a clear violation of the Agreement because state money intended for

the members of the plaintiff class were spent on individuals outside the class.  Plaintiffs point to

Defendants' own policy, which provides that, during the last 90 days of a fiscal year, all unused

CDS funds will be distributed to class members on a first come, first served basis.  Plaintiffs state

they "would have no objection to Defendants' failure to disburse the full CDS amount if, after

Defendants made a good faith effort to identify and inform all persons eligible for CDS funds, that

failure were based on a technicality such as only 2000 class members needing these funds." (Docket

Entry No. 232, Reply Memorandum at 4.)  But Plaintiffs deny that Defendants made a good faith

effort to distribute the CDS funds to those entitled to them, and Plaintiffs again point to the Carter

and Marcellino declarations as evidence of this.

**B.  Interim Support Services**

Section VI. D. of the Agreement provides:

> There shall be additional interim services provided to the plaintiffs if the
> defendants have not obtained CMS approval and began enrolling persons in the Self-
> Determination Waiver by July 1, 2004.  For each month that the State has failed to
> obtain approval and begin enrollment, the defendants will provide $500,000 per
> month in state funds to serve Medicaid-eligible individuals on the DMRS waiting list
> who meet ICF/MR level of care criteria as determined through the Pre-Admission
> Evaluation (PAE) process.  No person shall receive more than $30,000 per year
> interim services.  Persons receiving interim services may be transitioned to the Self-
> Determination Waiver upon approval of the waiver by CMS.

(Docket Entry No. 218-1 at 17.)  This provision was placed in the Agreement to encourage DMRS

to act quickly to obtain approval of the new SD waiver from CMS.  DMRS received approval for

15

the new waiver and began enrolling individuals into the waiver on April 14, 2005. Thus, under Section VI. D. of the Agreement, Plaintiffs claim that DMRS was obligated to spend $4.5 million in state funds for interim services for persons on the waiting list between July 2004 and April 2005. DMRS reported in May 2005, however, that as of April 2005, it had distributed a total of only $536,908.00 in state funds for interim services. (Docket Entry No. 218-4.) According to Plaintiffs, this results in a deficiency of $3,963,092.00 that should have been spent on interim services. Plaintiffs claim the money that should have been spent on them for interim services, like the money earmarked for consumer directed support, was instead used to provide waiver services for individuals who had already been removed from the waiting list. (Docket Entry (Docket Entry No. 228-1 at 29-30, Norris Depo.)

Defendants report that the State provided interim services to 453 members of the Plaintiff class during the period, expending approximately $5,269,556.19 in state funds through March 31, 2005 to do so.[8] (January 23, 2008 Hr'g, Def. Ex. 1; Docket Entry No. 230-8.) Defendants also reveal that the State spent another $160,703.90 in state funds providing interim services to individuals who were subsequently determined to be outside of the plaintiff class (most of whom turned out to be not eligible for Medicaid), for a grand total of $5,430,260.09 expended on interim services.

Commissioner Norris indicates he is aware Plaintiffs point to a DMRS document showing that the State spent only $536,908 in state funds for interim services during the applicable time period, but he attests that the document on which Plaintiffs rely does not capture the full amount that

---

[8]This figure and the exhibit support it were revised between the time the Defendants responded to the motion and the hearing. Thus, the outline of the parties' positions is based on their briefs, not the hearing exhibit, although the Court relies on the hearing exhibit in making its decision.

the State spent providing additional interim services, utilizing state funds, to Medicaid-eligible individuals on the waiting list. He says that the expenditures referenced by Plaintiffs are limited to state funds expended on individuals enrolled in the precursor of what became the SD waiver upon approval by CMS. In addition to those expenditures, however, the State provided state-funded interim services to many other individuals during the period between July 1, 2004 and April 14, 2005 who were subsequently converted to the HCBS or SD waivers. (Docket Entry No. 231, Norris Decl. ¶¶ 20-21.)

Moreover, Norris attests, the State enrolled many more individuals in the crisis category from the waiting list into the HCBS waiver during this period, and spent far greater amounts of state funds providing services to them. Expenditures under the SD waiver are capped at $30,000 per year, and as a result, individuals on the waiting list with the greatest needs could not be appropriately serviced on the SD waiver. Accordingly, DMRS enrolled as many of those individuals as possible into the HCBS waiver. While the CMS moratorium on the HCBS waiver was still in place during this period, CMS did permit the State to enroll individuals in crisis in the HCBS waiver notwithstanding the moratorium. As a result, the State was able to deploy the bulk of the state funds that it agreed to spend in Section VI. D. of the Agreement in a manner that served far more people because each state dollar spent on the HCBS waiver was matched by two federal dollars and served those persons on the waiting list with the greatest needs. (Id. at ¶ 21.)

Plaintiffs respond that the information Defendants provided to them prior to December 4, 2007 showed that the State spent only $536,908.20 in interim support services. It was not until December 4, 2007 that Defendants provided to the Plaintiffs the accounting for interim support services (Docket Entry No. 231-8) attached as an exhibit to Commissioner Norris' Declaration. (Docket Entry No. 233-6, Cover Letter.) Plaintiffs claim it is improper for the State to take credit

for money paid for HCBS waiver services that were matched by federal funds. The Agreement was written so that the State would provide $500,000 per month in its own money in interim support services in the months before the SD waiver was approved. Additionally, the Agreement capped the amount to be spent on each person at $30,000 a year, and Plaintiffs argue that Defendants should not be allowed to take credit for state money spent on those individuals who received more than $30,000 per year. Taking the information from Defendants' accounting exhibit, Plaintiffs devised their own exhibit (Docket Entry Nos. 232-6, 233-1, Exs. F & G), and recalculated the total amount of interim support services they believe should be counted. They reached a figure of $1,254,777.86, rather than the State's total figure of $5,430,260.09. Subtracting what they say the State actually paid for interim services under the Agreement–$1,254,777.86–from the $4.5 million the State should have paid, Plaintiffs ask that the Court to award them the difference–$3,245,222.14.

In conducting this calculation, Plaintiffs eliminate any of the funds, state or federal, included in the column "Waiver Payment to Provider–6 & 9" on the ground that this column represents money the State improperly spent on HCBS waiver services in order to receive matching federal dollars prior to the time CMS approved the new SD waiver. Plaintiffs point to the column titled "Payment to Provider - 5 & 8 Service Codes" as showing pure state dollars spent on interim services. However, they reason that any individual who received more than $30,000 per year, in excess of the cap established by Section VI. D. of the Agreement, must be eliminated from the calculation. Thus, Plaintiffs turn to the "Total cost" column and calculate the totals for each person listed. For those who received more than $30,000 per year, Plaintiffs add up the amounts of pure state payments made for those individuals, shown in the column "Payment to Provider - 5 & 8 Service Codes." This total equals $1,485,771.77 in state dollar payments Plaintiffs say were improperly spent, and they do not count them toward the State's $4.5 million obligation in interim

18

support services.  Subtracting $1,485,771.77 from $2,733,549.63, the total that Defendants claim to have made in state payments (Docket Entry No. 233-1 at 62), Plaintiffs reach a figure of $1,254,777.86, which is the most they say Defendants can claim credit for paying out in interim support services.

## C.  Community Infrastructure Development

Plaintiffs contend that the Defendants made a commitment in the <u>Preamble and Guiding Principles</u> section of the Agreement (Docket Entry No. 218-1 at 7-8, Agreement) to pursue two avenues:  (1) develop the mental retardation system infrastructure and provider network capacity necessary to support the expansion of quality home and community based waiver services; and (2) develop an appropriate planning process for the future expansion and/or development of home and community based waiver programs and services for Medicaid-eligible persons with mental retardation on the DMRS waiting list and to develop MR services system infrastructure. Specifically, Plaintiffs contend that in years one and two, Defendants violated Section VI. E. of the Agreement, which provides:

> Defendants will immediately begin implementation of measures to address community infrastructure needs.  The infrastructure development plan will include measures designed to address the service system design, including service coordination, quality assurance, stakeholder communication, and fiscal accountability; as well as provider network capacity.  These measures will be designed to assist the defendants[] in obtaining relief from the moratorium by CMS for new admissions to the existing Home and Community Based Services Waiver. Defendants agree to exert their best efforts to obtain relief from this moratorium and shall report to the parties at least quarterly the status of those efforts.  If the defendants have not achieved complete relief from the moratorium by July 1, 2005, the plaintiffs, at their sole option, may declare this Agreement dissolved and thereafter request the Court to set a case management conference to set a scheduling order and trial date.

Plaintiffs assert that the State was required to begin immediately to implement measures to address community infrastructure needs, including provider network capacity.  Plaintiffs take the position

19

that infrastructure development is a continuing obligation which is necessary for achievement of the Agreement's goal of substantially reducing or eliminating the waiting list.

Despite these commitments of the Defendants in the Agreement and the explicit language of Section VI. E., Plaintiffs claim that Defendants engaged in few, if any, meaningful efforts in the first two years of the Agreement to assess or increase the capacity of the provider network in Tennessee.  In addition, Plaintiffs state, the few efforts that Defendants did make occurred near the end of the two-year period when it was already too late for such efforts to result in an increased provider network capacity for years three, four, and five of the Agreement.  Despite the West Tennessee Community Development Planning Taskforce's June 2006 issuance of a plan designed to ensure development of the provider network in that region, DMRS did not respond to the taskforce recommendations and failed to implement virtually all of the recommendations.  (Docket Entry No. 219-4, Ex. I.)  Commissioner Norris stated that DMRS had not implemented the recommendations of the taskforce because DMRS had not gotten to it yet.  (Docket Entry No. 228-2 at 14, 17, Norris Depo.)   He further acknowledged that DMRS regional directors were not given goals or quotas regarding growth of the provider network or required to document their efforts to contact existing providers regarding expansion of the network.  He also agreed that Defendants have not performed any comprehensive survey of growth capacity of current or new providers and stated the idea to conduct such a survey had not occurred to him.  He expressed surprise that one survey of existing providers apparently was conducted by regional DMRS staff, and he was not aware of a document called the 2006-2007 DMRS GAPS in Services Form which indicated that surveys concerning new provider development were responded to by nine providers in the East Region, eight in the Middle Region, and three in the West Region.  (Docket Entry No. 222-3.) DMRS' assessment of the ability of the provider network to grow is not based on empirical evidence, but on nothing

20

more than Commissioner Norris' instincts that a certain number of persons can be served by the provider network. (Docket Entry No. 219-3 at 34-35, 41-44, Norris Depo.)

Plaintiffs complain that to date, Defendants have failed to even create a comprehensive list of existing service providers, and Defendants have undertaken unilateral efforts to restrict enrollment into waivers to fifty (50) persons per month because of limited provider network capacity. During March 2006 and February 2007, Defendants themselves submitted revisions to CMS that requested a reduction in the number of available waiver slots and thereby ensured that there would be a reduction in the maximum number of waiver participants approved by CMS. This caused the number of individuals on the waiting list to increase and virtually assures that the goals of the Agreement will not be met by the end of year five.

Commissioner Norris testified that a reduction in waiver slots in fiscal year 2006-2007 was imperative to give the State "breathing space" after enrolling so many people into the waivers in the first two years of the Agreement at greater cost to the State than anticipated. (Docket Entry No. 219-2 at 2, 5, Norris Depo.; Docket Entry No. 219-3 at 48, Norris Depo.) Because so many DMRS resources were devoted to getting the moratorium lifted and achieving approval of the new SD waiver, Commissioner Norris acknowledges that achieving growth in the provider network was not a top priority. However, Defendants took other important and preliminary steps to improve the provider network, such as severing ties with providers giving substandard services, writing a provider manual to set service definitions, rewriting the rate structure so that the system is more predictable for providers, and clarifying the role of support coordination agencies. With these critical improvements well underway, Commissioner Norris admits that Defendants are "not very far" in developing the provider network, but he agrees that the work must be done, (Docket Entry No. 219-3 at 24-26, 29, Norris Depo.) and believes that Defendants can devote more resources to

encouraging growth in the provider network. (Docket Entry No. 219-2 at 7-13.) He harbors serious doubt that the provider network capacity can grow to the extent necessary to eliminate the waiting list by year five, but he does think the waiting list can be reduced significantly. (Id. at 3, 17-18; Docket Entry No. 219-3 at 32, 38, 46, 50, 52.)

Defendants take the position that Section VI. E. obligated them to develop and implement an infrastructure development plan "designed to assist the defendants in obtaining relief from the moratorium by CMS for new admissions to the existing Home and Community Based Services Waiver[,] and they claim that they did so. Specifically, DMRS developed the Blueprint Workplan and implemented it during the second half of 2004 and the first half of 2005. (January 23, 2008 Hr'g, Def. Ex. 2.) Defendants contend that, in accordance with the Blueprint Workplan, DMRS put into place a host of infrastructure improvements during fiscal year 2004-2005, including implementation of: (1) a new Quality Management System that included a Protection from Harm segment and a revised Quality Assurance assessment; (2) a new service system design in the form of a provider oversight structure that includes compliance monitoring and technical assistance on a regional and statewide basis; (3) a standardized assessment process using the Inventory for Client and Agency Planning to determine individual level of service needs for each individual in the service delivery system; (4) a revision of the Individual Support Planning process, which now includes a risk assessment component and a streamlined format; (5) a new rate structure system designed to attract new providers; (6) a new Provider Manual designed to capture all provider requirements in a single document; (7) a "Real Systems Change Grant" awarded by CMS to initiate a new Consumer and Family Satisfaction Survey; and (8) Satisfaction Surveys for Direct Support Professionals and Independent Support Coordinators. In addition, DMRS created an Advisory Council consisting of stakeholders including parents, service recipients, providers, advocates, TennCare representatives,

and DMRS staff to improve communications concerning systems implementation, policies and procedures, data management, and new ideas. (Docket Entry No. 231, Norris Decl. ¶ 23. & Ex. F.) As a result of these efforts, Defendants contend, CMS lifted the moratorium on new admissions into the HCBS waiver and approved the SD waiver effective April 14, 2005. (Id. ¶ 24.) Thus, Defendants contend they are in compliance with Section VI. E. of the Agreement.

In reply, Plaintiffs suggest that Defendants cannot have their cake and eat it, too. They cannot claim that they took adequate steps to develop a provider network and yet also claim that they can enroll only 50 individuals a month into waiver services because the provider network cannot handle higher growth. In order to develop a provider network sufficient to meet the needs of years three through five, Plaintiffs contend that Defendants should have done more to assess the provider network comprehensively and develop it in years one and two, but Defendants failed to engage in this fundamental task. Plaintiffs rely on the testimony and exhibits introduced at the deposition of Linda Maurice, DMRS' provider enrollment coordinator, in support of the argument that only one small-scale survey was done that showed a capacity for provider growth, no one at DMRS followed up on the survey, and Commissioner Norris was not even aware of the survey. Expansion or recruitment of new providers fell to regional directors or Brian Dion of the DMRS central office, but Defendants did not require these persons to keep any records reflecting what efforts they made to improve the provider network in the first two years of the Agreement. No goals were set for recruiting new providers or expanding existing ones. Defendants did not change the structure for recruiting providers until July 2007, over three years into the Agreement. Plaintiffs contend that they raised concerns with DMRS early in years one and two about steps to be taken to evaluate and develop the provider network and they deny Defendants' current position that Plaintiffs did not make their concerns known until now. (Docket Entry No. 233-7, Ex. M.) Although Defendants

argue that they were required only to grow infrastructure in order to obtain relief from the moratorium, Plaintiffs emphasize that the language of the Agreement makes clear that infrastructure development is an ongoing obligation for the purpose of substantially reducing or eliminating the waiting list.

### III. STANDARD OF REVIEW

District courts retain inherent power to enforce agreements entered into in settlement of litigation pending before them. Bamerilease Capital Corp. v. Nearburg, 958 F.2d 150, 152 (6th Cir. 1992). In this case, the Court retained jurisdiction over the parties' Settlement Agreement according to its express terms. (Docket Entry No. 218-1, Settlement Agreement, Section IX.B.3.)

"Settlement agreements are a type of contract subject to principles of state contract law." Bamerilease Capital Corp., 958 F.2d at 152; Sweeten v. Trade Envelopes, Inc. 938 S.W.2d 383, 385 (Tenn. 1996). Under Tennessee law, the essential elements of a breach of contract claim are: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) damages caused by the breach of contract. ARC Lifemed, Inc. v. AMC-Tennessee, Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). A contract must be interpreted and enforced according to its clear, plain, and unambiguous terms. Gates, Duncan & Vancamp v. Levatino, 962 S.W.2d 21, 25 (Tenn. Ct. App. 1997). "When the language of the contract is unambiguous and there is no claim of fraud or mistake, the court must give effect to the intention of the parties as expressed in the language used in the agreement." Id. Moreover, the "law conclusively presumes that the parties to a contract understood its obligations, and evidence is not admissible to show that their understanding was in fact otherwise." Id. If the contract is deemed ambiguous, then the court may weigh extrinsic evidence to aid in the construction of the contract. Hamilton v. Gibson County Util. Dist., 845 S.W.2d 218, 224 (Tenn. Ct. App. 1992).

Case 3:00-cv-00665   Document 250   Filed 07/08/08   Page 24 of 33 PageID #: 2446

Specific performance is an equitable remedy, and generally a court will not award specific performance of a contract unless an award of damages is deemed an inadequate remedy. Hillard v. Franklin, 41 S.W.3d 106, 111 (Tenn. Ct. App. 2000). Before a court may grant specific performance of a contract, the court must find the contract is clear, complete and definite in all its essential terms. Id. The agreement must show beyond doubt that the minds of the parties actually met, and the agreement must be free from any suspicion of fraud or unfairness. Id. The determination whether a settlement agreement should be enforced lies within the discretion of the court and depends on the facts of each case. Id.

## IV. ANALYSIS

Preliminary to the contract analysis, Defendants raise once again their contention that the Agreement should now be vacated under Section IX.B.5.d., more than two years after approval of the Agreement, on the ground that Defendants are in compliance with federal law as stated in Westside Mothers v. Olszewski, 454 F.3d 532, 540 (6th Cir. 2006) and Mandy R. v. Owens, 464 F.3d 1139, 1143 (10th Cir. 2006). According to Defendants, these cases establish that Plaintiffs cannot state a claim under 42 U.S.C. §§ 1396a(a)(8) and (a)(10), the statutes underlying this lawsuit, because Defendants' only duty under those statutory provisions is to provide "financial assistance" to Medicaid beneficiaries, and Defendants have satisfied that duty. Defendants contend they are under no duty to ensure that service providers are actually available; their only obligation is to furnish reimbursement to those beneficiaries who do, in fact, procure providers, and this the State has done.

The Court addressed the argument previously in a Memorandum and Order (Docket Entry Nos. 199 & 200) denying Defendants' Motion To Vacate The Agreed Order Approving The Settlement Agreement And To Dismiss The Case. Defendants appealed the Court's Order, and the

25

appeal is currently pending in briefing before the Sixth Circuit. The Court will not reiterate its entire analysis here, but will rely on the prior Memorandum and Order to again reject Defendants' argument for the same reasons stated previously.

Turning to the remaining issues before the Court, there is no question that the parties to this suit fairly negotiated their Agreement, that the parties reached a meeting of the minds as to the terms of the Agreement expressed therein, and that an enforceable contract in settlement of litigation was made and approved by the Court. At issue is whether Plaintiffs have established Defendants' nonperformance amounting to a breach of the contract and if so, whether specific performance is an appropriate equitable remedy for the Court to apply to remedy any breach.

## A. Consumer Directed Support

The Court concludes that Plaintiffs have not established by evidence Defendants' nonperformance of Section VI. C. of the Agreement to warrant specific performance of that provision. In accordance with the Agreement, Defendants devised and launched the consumer directed support program on time beginning in mid-September 2004. The program was phased in over the 2004-2005 fiscal year as contemplated by the Agreement. Defendants made various efforts through case manager contacts, town hall meetings and mail to reach individuals eligible for consumer directed support and to urge them to apply for the funds. Defendants provided contact information, including that for Plaintiffs' counsel, so that individuals could call to ask any questions about consumer directed support and family support services.

Defendants adopted a written policy, No. 04.300.10.13, to ensure compliance with the Agreement and to meet the needs of individuals on the waiting list. The policy established a statewide and standardized process to assure fairness in the distribution of consumer directed support funds. Those persons who applied received funds, and Plaintiffs produce no evidence

26

otherwise. The Agreement did not require Defendants to expend $5 million each year; the Agreement provided that consumer directed support funds "will be capped at an amount of $2280 per person per year *not to exceed* a total fiscal year annual expenditure *of more than $5 million*."

Plaintiffs allege that Defendants did not make good faith efforts to identify eligible participants and expend $5 million in services for them in each of the first two years of the Agreement. There are several difficulties with Plaintiffs' position. First, Plaintiffs produced no evidence that Defendants failed to act in good faith to identify eligible participants, while Defendants produced evidence that they did act in good faith to reach and inform eligible participants. Plaintiffs have not suggested what more Defendants should have done to communicate the availability of consumer directed support funds to the appropriate constituency. Second, Plaintiffs fail to produce evidence that there were sufficient numbers of individuals in the "crisis," "urgent," and "active" categories in fiscal years 2004-2005 and 2005-2006 who specifically needed consumer directed support services, as opposed to family support services, to justify the expenditure of $5 million per year on those individuals. Third, Plaintiffs did not address Defendants' position that funds remained at the end of the first two fiscal years simply because eligible participants did not apply. Plaintiffs appear to suggest that Defendants should have awarded each eligible individual the maximum capped amount in services annually, regardless of whether each person applied or actually needed the services. The general language of Section VI. C. of the Agreement did not impose any such affirmative obligation on the Defendants; rather, that section of the Agreement provided only that Defendants would develop a program to provide consumer directed support funds, capped at $2,280 per person per year not to exceed a total fiscal year annual expenditure of more than $5 million. The Defendants complied with the letter of this provision.

Plaintiffs also allege that Defendants did not manage properly the funds remaining in the consumer directed support program, including the money left in the reserve fund, at the end of each fiscal year and that Defendants spent leftover funds to benefit waiver enrollees, not plaintiff class members. The Agreement is completely silent as to how leftover consumer directed support funds would be spent. Thus, Plaintiffs face an insurmountable obstacle in convincing the Court that Defendants breached Section VI. C. of the Agreement when the parties did not include in that section any term expressly addressing the issue of leftover consumer directed support funds.

The policy Defendants adopted did provide that "ninety (90) days prior to the end of the fiscal year, all unused and unencumbered funds will be redistributed on a first come first served basis to all eligible individuals using the criteria set forth in section IV.A." Other than Ms. Marcellino's declaration indicating that one case manager reported the State would disburse reserve funds only on request of an eligible individual, Plaintiffs did not produce any evidence that Defendants universally failed to award reserve funds on a first come first served basis. For all the Court knows from this factual record, every eligible individual who applied for reserve funds received them and there was still money left over. Even Plaintiffs' declarants do not state under oath that they were denied reserve funds. Plaintiffs have not produced sworn testimony of any eligible recipient who was denied consumer directed supports from the reserve fund.

But all of this is really beside the point in any event. Plaintiffs state in their Reply Memorandum that they "are not asking this Court to require Defendants to comply with their own policy. Instead, Plaintiffs are simply asking this Court to require Defendants to comply with the Settlement Agreement that Defendants willingly entered." (Docket Entry No. 232, Reply Memorandum at 4.) As the Court previously stated, the evidence before the Court shows that the Defendants complied with Section VI. C of the Agreement. The Agreement was silent on the year-

end disposition of consumer directed support funds. Defendants used the leftover funds to benefit HCBS waiver participants, many of whom had been recently enrolled from the waiting list (the plaintiff class) upon approval of the Agreement. Therefore, the Court declines to order specific performance on this issue.

**B. Interim Services**

This issue boils down to a factual dispute about the amount Defendants spent on interim services between July 2004 and April 2005. Information given to the Plaintiffs by the Defendants varies greatly–from $536,908.00 expended during the relevant period (according to the May 2005 monthly report) to $5,269,556.19 expended during the relevant period (according to the document first provided to Plaintiffs on December 4, 2007).

Due to the extraordinary difference between these two figures provided at different times by the Defendants, the Court can understand the Plaintiffs' frustration in receiving what appears to be incomplete or inaccurate accounting information from the Defendants. Also, like the Plaintiffs, the Court is inclined to conclude that, by claiming the larger figure in December 2007 while the instant motion was being briefed by the parties, the Defendants appear to be trying to take credit for state expenditures that may not be properly categorized as interim support services. Plaintiffs do not ask the Court to disregard the December 2007 accounting document in its entirety, but to rewrite it so that the figures favor the Plaintiffs.

Having carefully considered Plaintiffs' calculations and Defendants' explanation of the exhibits, the Court finds that Defendants expended $4,571,134.01 on interim services during the applicable period of July 2004 to April 2005, as shown on Defendants' Exhibit 1 produced at the January 23, 2008 hearing. As shown in that exhibit, Defendants subtracted $698,422.18 that the State spent on individuals who received more than the $30,000 cap in a given year. Even deducting

29

this amount, Defendants expended over $4.5 million on interim services. Thus, the Court determines that Plaintiffs failed to show that Defendants breached Section VI. D. of the Agreement, and an Order of specific performance is not warranted.

## C. Community Infrastructure Development

Finally, the Court reaches the issue of whether Defendants' seeming delay in taking steps to expand capacity of the current provider network or to recruit new providers so that more individuals can be accommodated from the waiting list is a violation of Section VI. E. of the Agreement. Defendants claim that their commitment to developing community infrastructure was really made only, as Section VI. E. states in part, to "assist the defendants[] in obtaining relief from the moratorium by CMS for new admissions to the existing Home and Community Based Services Waiver." Having accomplished the lifting of the moratorium in the Spring of 2005, Defendants seem to suggest that their obligation to develop the provider network was then at an end.

The Court does not accept Defendants' narrow view of Section VI. E. because, at the time the Agreement was executed, Defendants' commitment to community infrastructure development was broader and was memorialized in the Agreement itself. Section VI. E. must be read in light of the Agreement's Preamble and Guiding Principles, in which Defendants made a commitment to develop the mental retardation system infrastructure and provider network capacity necessary to support the expansion of quality home and community based waiver services, and to develop an appropriate planning process for the future expansion and/or development of home and community based waiver programs and services for eligible individuals on the waiting list. Commissioner Norris has repeatedly acknowledged under oath DMRS' obligation under the Agreement to pursue these goals. In fact, in response to this motion, Defendants highlighted all of the steps they took, starting even before the Agreement took effect, to improve quality management of the provider

30

network, streamline procedures, and re-write the rate structure, among other achievements. Commissioner Norris has continually emphasized that it was necessary to make these fundamental changes first in order to lay a proper groundwork for capacity expansion in the provider network. He candidly stated more than once under oath that DMRS simply "hasn't gotten to" many of the additional planning steps that are needed to improve community infrastructure development.

Plaintiffs are understandably frustrated because they have been making known to Defendants since shortly after the Agreement went into effect their concern that failure to plan for and develop the provider network adequately in years one and two would seriously impact DMRS's ability to substantially reduce or eliminate the waiting list by the end of year five. Defendants have not acted as quickly as Plaintiffs would like and at times it seems the left hand of DMRS does not know what the right hand is doing. There has not been a comprehensive empirical analysis of what the provider network can bear; rather, DMRS proceeds on the instincts of Commissioner Norris as to what the system can bear. DMRS staff have identified gaps in available services in various counties and regions of the State, but little to nothing has been done to close the gaps. In the meantime, the waiting list grows larger and the number of eligible persons enrolled every month from the waiting list decreases.

While the Court does not disparage any of Plaintiffs' legitimate concerns, the Court's role is simply to determine whether Plaintiffs have shown that Defendants breached Section VI. E. as it is written. The Court concludes that Plaintiffs have not shown a breach. Section VI. E. is very general in its terms and does not set any specific time limits by which Defendants should accomplish particular tasks in developing community infrastructure. The pertinent part of the Section states:

> Defendants will immediately begin implementation of measures to address community infrastructure needs. The infrastructure development plan will include measures designed to address the service system design, including service

coordination, quality assurance, stakeholder communication, and fiscal accountability; as well as provider network capacity.

All of the steps Defendants took in years one and two fell within the named categories, and Defendants undertook some of the steps even before the Agreement was signed. Defendants drew up the Blueprint Workplan and implemented it during late 2004 and early 2005.

Like Plaintiffs, the Court is left with the sense that perhaps Defendants could have done more in years one and two to analyze the provider network capacity, recruit new providers, and encourage expansion by current providers. On the other hand, the Court understands Commissioner Norris' point that all of the steps DMRS did take were necessary to correct fundamental flaws in the system and to make it more predictable so that providers would be willing to join the system or expand it. Such developments take time, money and effort and they often evolve at a snail's pace. But it is not the Court's job to tell the State how to prioritize its resources to develop community infrastructure faster when the parties themselves have not specified in their Agreement any dates or methods by which particular tasks must be done. The Court is powerless to rewrite the parties' bargain as stated in the Agreement. Consequently, the Court concludes in light of the broad language of Section VI. E. that Plaintiffs have not shown a breach by the Defendants.

In light of these conclusions, it is not necessary for the Court to reach Defendants' remaining arguments that the State is immune under the Eleventh Amendment from suit for failure to follow its own policy, that the relief sought would usurp Tennessee's control of its budget, or that the relief sought would entail modification of the Agreement.

## V. CONCLUSION

For all of the reasons stated, Plaintiffs' Second Amended Motion For An Order For Specific Performance For Non-Compliance With Settlement Agreement (Docket Entry No. 218) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE