# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **LAKERSKO BROWN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:00-0665** |
| | ) | **JUDGE ECHOLS** |
| **TENNESSEE DEPARTMENT OF** | ) | |
| **FINANCE AND ADMINISTRATION** | ) | |
| **and M.D. GOETZ, Jr., Commissioner,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court are Defendants' Motion For Summary Judgment (Docket Entry No. 266) and Plaintiffs' Motion For Summary Judgment (Docket Entry No. 269). The parties fully briefed these motions.

Also, on March 9, 2009, the Sixth Circuit reversed in part and remanded this Court's Memorandum and Order (Docket Entry Nos. 199 & 200; 2007 WL 2710704 (M.D. Tenn. Sept. 12, 2007)), denying Defendants' Motion to Vacate the Agreed Order Approving the Settlement Agreement and to Dismiss the Case (Docket Entry No. 155). <u>Brown v. Tennessee Dept. of Finance and Admin.</u>, 561 F.3d 542 (6th Cir. 2009). At the time the Motion to Vacate was originally filed on January 19, 2007, Plaintiffs filed a response (Docket Entry No. 175), and Defendants filed a reply (Docket Entry No. 179). These filings are once again before the Court. The Motion to Vacate must now be ruled upon in light of the Sixth Circuit's recent opinion and its instructions on remand.

1

**A. Procedural posture**

On May 1, 2001, the Court certified a class comprised of mentally retarded Tennessee residents. Members of the certified class are eligible for Medicaid services through State and privately owned Intermediate Care Facility/Mental Retardation ("ICF/MR") facilities, pursuant to 42 U.S.C. § 1396a, or they are eligible for home-based services through a Home and Community-Based Services ("HCBS") waiver for the mentally retarded, pursuant to 42 U.S.C. § 1396n. The class members complain that they request services under these programs, but (1) they are denied the opportunity to apply for such services; (2) when they do apply for services under these programs, they are denied; or (3) they are placed on a long, slow-moving waiting list for services under these programs. Following denial of the parties' cross-motions for summary judgment and a fairness hearing, the Court entered an Agreed Order on June 17, 2004, approving a Settlement Agreement ("the Agreement") executed by the parties. (Docket Entry No. 116.)

In the years after the Agreed Order was entered, some of the parties' goals as expressed in the Agreement were satisfied, while others were not. The parties have engaged in ongoing litigation about whether the terms of the Agreement have been met or will be met before the Agreement expires on December 31, 2009, absent any written continuation of the Agreement that may be obtained as provided in Section XII.B. of the Agreement.

In September 2007, the Court denied Defendants' Motion to Vacate the Agreed Order Approving the Settlement Agreement and to Dismiss the Case (Docket Entry No. 155), as well as Plaintiffs' Motion For Modification of the Settlement Agreement (Docket Entry No. 166). Defendants appealed the Court's denial of the Motion to Vacate, and as previously mentioned, the Motion to Vacate is the subject of the Sixth Circuit's recent reversal and remand on March 9, 2009.

Previously, in July 2008, the Court denied Plaintiffs' Second Amended Motion For An Order For Specific Performance For Non-Compliance With Settlement Agreement (Docket Entry No. 218). That motion challenged Defendants' compliance with certain terms relating to years one and two of the Agreement. The Court held that Plaintiffs failed to show that the Defendants breached the terms of the Agreement that applied to years one and two, and thus, the Court denied the motion for specific performance. (Docket Entry Nos. 250 & 251, Memorandum and Order; 2008 WL 2704362 (M.D. Tenn. July 8, 2008).) Plaintiffs did not appeal.

Section VII of the Agreement, entitled "Long-Range Planning," required the parties to engage in negotiations to try to reach agreement about expansion of enrollment and provision of services in waiver programs for the third, fourth and fifth years of the Agreement. Although the parties engaged in negotiations, they were unable to reach accord, and the Magistrate Judge declared an impasse. As contemplated by Section VII of the Agreement, the Court then set a trial date to determine the extent of the Defendants' obligations in years three through five. In advance of the trial date, the parties filed cross-motions for summary judgment which are the motions presently pending before the Court. Thus, the summary judgment motions concern the number of individuals who must be enrolled in MR waiver programs and the obligations of the parties in years three through five of the Agreement.

The Sixth Circuit's recent decision was issued before the Court could rule on the summary judgment motions. In light of the appellate decision, the Court continued the trial date and allowed the parties an opportunity to supplement their summary judgment briefing with discussions about the impact of the Sixth Circuit decision on the case. The Court need not rule on the substance of the summary judgment motions if the Court determines that Defendants' Motion to Vacate should be

granted in its entirety in light of the Sixth Circuit opinion. Therefore, the Court will begin with the Motion to Vacate.

## B. Defendants' Motion to Vacate the Agreed Order

*1. The Defendants' position*

Defendants moved to vacate the Agreement and dismiss the case in its entirety. The Defendants argued that, at the time the parties negotiated the Agreement, they mutually labored under a fundamental misunderstanding that the phrase "medical assistance" in the Medicaid statute meant that States must provide qualified individuals with medical services directly, not merely financial reimbursement for such services.

Defendants reasoned that Plaintiffs' First Amended Complaint alleged the existence of the DMRS[1] waiting list violated 42 U.S.C. § 1396a(a)(8) & (10) in that the State failed to provide services with reasonable promptness and on equal footing with other Medicaid services. Section 1396a(a)(8) (emphasis added) requires that "[a] state plan for *medical assistance* must[] provide that all individuals wishing to make application for *medical assistance* under the plan shall have opportunity to do so, and that *such assistance* shall be furnished with reasonable promptness to all eligible individuals." Section 1396a(a)(10)(B) (emphasis added) requires that "[a] state plan for *medical assistance* must[] provide . . . that the *medical assistance* made available to any individual described in subparagraph (A)-- (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and (ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A)."

---

[1]"DMRS" refers to the Tennessee Division of Mental Retardation Services.

4

According to Defendants, federal courts had widely assumed that the phrase "medical assistance" encompassed the direct provision of medical services by the State. See e.g. Bryson v. Shumway, 308 F.3d 79, 88 (1st Cir. 2002); Doe v. Chiles, 136 F.3d 709, 716 n.13 (11th Cir. 1998); Sobky v. Smoley, 855 F.Supp. 1123, 1147 (E.D. Cal. 1994). Moreover, because courts had held that §§ 1396a(a)(8) and (10) applied to the administration of Medicaid waiver programs, the definition of "medical assistance" was also applied by courts to the provision of waiver services, at least up to the number of approved available slots within the waiver program. See e.g., Boulet v. Cellucci, 107 F.Supp.2d 61, 77-78 (D. Mass. 2000); Lewis v. New Mexico Dept. of Health, 94 F.Supp.2d 1217, 1234 (D. N.M. 2000). The only contrary view at the time appeared in dicta in Bruggeman v. Blagojevich, 324 F.3d 906, 910 (7th Cir. 2003), in which a Seventh Circuit panel observed:

> Even if [plaintiffs] did require emergency treatment, their theory of violation would be a considerable stretch because the statutory reference to 'assistance' appears to have reference to *financial* assistance rather than to actual medical *services*, though the distinction was missed in Bryson v. Shumway, 308 F.3d 79, 81, 88-89 (1st Cir. 2002), and Doe v. Chiles, 136 F.3d 709, 714, 717 (11th Cir. 1998). Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals. The regulations that implement the provision indicate that what is required is a prompt determination of eligibility and prompt provision of funds to eligible individuals to enable them to obtain the covered medical services that they need, see 42 C.F.R. §§ 435.911(a), .930(a)-(b); a requirement of prompt *treatment* would amount to a direct regulation of medical services.

Defendants asserted in their Motion to Vacate that the legal landscape changed when the Sixth Circuit decided Westside Mothers v. Olszewski, 454 F.3d 532 (6th Cir. 2006) ("Westside Mothers II"). In describing Westside Mothers II, the Defendants contended that the Sixth Circuit adopted the dicta in Bruggeman and held that "medical assistance" means states must furnish only "financial assistance" or *payment* for medical services. The appellate court construed 42 U.S.C. § 1396d(a), which defines "medical assistance," as "payment of part or all of the cost of [listed] care

5

and services" for Medicaid-eligible individuals. Defendants also argued that, after the Westside Mothers II case, the Tenth Circuit decided Mandy R. v. Owens, 464 F.3d 1139, 1143 (10th Cir. 2006). Because the "Medicaid Act defines 'medical assistance' as 'payment of part or all of the cost of the [described] care and services[,]'" the Tenth Circuit held that a state is required to pay for, but not provide, medical services. Id. Summing up, that court stated: "On its face, then, the Medicaid Act requires any state participating in Medicaid to pay promptly and evenhandedly for medical services when the state is presented with the bill. If that is all the statute requires, then the plaintiffs have no claim; they are on a waiting list for [ICF/MR] services, not a waiting list for payment for services." Id.

In light of these two cases, Defendants characterized the Agreed Order approving the Agreement as a consent decree and sought to vacate the Agreed Order under the authority of Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 387 (1992), and Sweeton v. Brown, 27 F.3d 1162, 1166 (6th Cir. 1994). Defendants contended that the intervening change in law brought about by the Westside Mothers II and Mandy R. decisions shattered the legal foundation upon which Plaintiffs' claim for injunctive relief was based. Defendants argued that the Agreement was based on a fundamental, mutual mistake about the meaning of governing law and that the Agreement imposed on state officials obligations that no longer bore any close relation to the requirements of federal law. Backed by the holdings of Westside Mothers II and Mandy R that states must provide payment, not medical services, Defendants postulated further that "sections 1396a(a)(8) and (a)(10) imposed no duty on the States to ensure the provision of medical *services*." (Docket Entry No. 156, Memorandum in Support at 14 (italics in original).)

6

*2. The <u>Westside Mothers II</u> opinion*

It is helpful to review the <u>Westside Mothers II</u> opinion in a neutral fashion, without viewing the case through the lens of the Defendants' position just discussed. In <u>Westside Mothers II</u>, the plaintiffs, both in the briefs filed before the district court and the Sixth Circuit, argued that 42 U.S.C. §§ 1396a(a)(8) and 1396a(a)(10) required the State of Michigan to actually provide, or arrange for, certain medical services, including care, medicine, and equipment. <u>Westside Mothers II</u>, 454 F.3d at 539. Thus, the Sixth Circuit said, "<u>the issue presented by this claim is whether the individual rights to 'medical assistance' created by these provisions impose[] an obligation on the State to provide services directly.</u>" <u>Id.</u> at 539-540 (emphasis added). After examining the text and the structure of the two statutes at issue, the Sixth Circuit panel stated it did "not believe §§ 1396a(a)(8) [and] 1396a(a)(10) require the State to provide medical services directly." <u>Id.</u> at 540. Rather, the phrase "medical assistance" refers to financial assistance to pay for needed services; not to the actual provision of the services.

The appellate panel said the "most reasonable interpretation" of § 1396a(a)(8) is "that all eligible individuals should have the opportunity to apply for medical assistance, i.e., financial assistance, and that such medical assistance, i.e., financial assistance, shall be provided to the individual with reasonable promptness." <u>Id.</u> To restate the Sixth Circuit's ruling, § 1396a(a)(8) means that all eligible individuals are entitled to an opportunity to apply for financial assistance and financial assistance shall be provided to the individual with reasonable promptness.

Further, the panel wrote, the "most reasonable interpretation of § 1396a(a)(10) is that medical assistance, i.e., financial assistance, must be provided for at least the care and services listed in paragraphs (1) through (5), (17) and (21) of § 1396d(a)." <u>Id.</u> In other words, under

7

§ 1396a(a)(10), the State must provide to eligible individuals financial assistance to pay for at least the care and services specified in certain paragraphs of § 1396d(a), although the Medicaid statutes permit the State to agree to pay for a broader range of services.

Also, the panel stated, the "regulations that implement these provisions also indicate that what is required is a prompt determination of eligibility and a prompt payment to eligible individuals to enable them to obtain the necessary medical services. See 42 C.F.R. §§ 435.911, 435.930." Id. Thus, the panel held that the State of Michigan is not required to provide services to eligible individuals directly, but the State must make a prompt determination of eligibility and make prompt payments to eligible individuals so that they can obtain the services they need.

The plaintiffs in Westside Mothers II tried to raise a new argument on appeal that had not been raised in the district court. At oral argument in the case, the plaintiffs asserted for the first time that the Medicaid payments made by the State "were insufficient to enlist an adequate number of providers, which effectively frustrate[d] §§ 1396a(a)(8) [and] 1396a(a)(10) by foreclosing the opportunity for eligible individuals to receive the covered medical services." Id. The plaintiffs argued they wanted an opportunity to show that Medicaid payments were so inadequate in the Upper Peninsula of Michigan that there were no available providers. Id. The appellate panel took note of cases that would support plaintiffs' new claim, citing Health Care for All, Inc. v. Romney, 2005 WL 1660677, at *10-11 (D.Mass. July 14, 2005) ("Setting reimbursement levels so low that private dentists cannot afford to treat Medicaid enrollees effectively frustrates [§1396a(a)(8)] by foreclosing the opportunity for enrollees to receive medical assistance at all, much less in a timely manner."); Oklahoma Chapter of Am. Academy of Pediatrics v. Fogarty, 366 F.Supp.2d 1050, 1109 (N.D. Okla. 2005) (finding a violation of § 1396a(a)(8) and reasoning that "[w]ithout financial assistance

8

(provider reimbursement) sufficient to attract an adequate number of providers, reasonably prompt assistance is effectively denied"); Sobky v. Smoley, 855 F.Supp. 1123 (E.D. Cal. 1994) (holding defendants liable for failure to comply with § 1396a(a)(8) where "insufficient funding . . . has caused providers of methadone maintenance to place eligible individuals on waiting lists for treatment").

Id. at 540-541.

> In response to plaintiffs' new argument, the Sixth Circuit panel stated:

> Because this appeal is from a dismissal for failure to state a claim, we are concerned with the sufficiency of the complaint, which does not contain this allegation [that Michigan's Medicaid waiver payments are inadequate to attract providers]. We therefore affirm the district court's dismissal of the claim for violations of §§ 1396a(a)(8), 1396a(a)(10). However, because plaintiffs may be able to amend the complaint to allege that inadequate payments effectively deny the right to "medical assistance," we modify the district court's order to reflect a dismissal without prejudice to the filing of a motion to amend along with a proposed amendment to the complaint.

Id. at 541.

Thus, the Sixth Circuit concluded that a dismissal for failure to state a claim was proper where the court construed plaintiffs' claim as alleging that the State of Michigan was required by Medicaid statutes to provide services directly. The State is required only to pay for the services, not provide them directly. The panel recognized, however, that plaintiffs might be able to state viable claims for relief against state officials under § 1983, §1396a(a)(8) and §1396a(a)(10), so long as the plaintiffs alleged that they are eligible individuals who were denied the right to apply for financial assistance; that financial assistance was not provided with reasonable promptness; that any financial assistance received was less in amount, duration or scope than the medical assistance made available to any other such individual; or that inadequate Medicaid payments by the State effectively denied plaintiffs the right to obtain private services from providers.

*3. Plaintiffs' First Amended Complaint in this Case*

On September 19, 2000, the Plaintiffs in this case filed a First Amended Complaint. When that Complaint's provisions are compared with the allegations that were before the Sixth Circuit on a motion to dismiss for failure to state a claim in Westside Mothers II, it is apparent that Plaintiffs here have alleged claims against Defendants under § 1983, §1396a(a)(8) and §1396a(a)(10) which pass muster under Westside Mothers II.

In reviewing the sufficiency of the First Amended Complaint, the Court must accept as true all of the Plaintiffs' allegations and resolve all doubts in their favor. See Morgan v. Church's Fried Chicken, 829 F.2d 10, 11-12 (6th Cir. 1987). While a complaint need not contain detailed factual allegations, the Plaintiffs must provide the grounds for their entitlement to relief, and this "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (abrogating Conley v. Gibson, 355 U.S. 41 (1957)). The factual allegations supplied must be enough to show a plausible right to relief. Id. at 940-942. A complaint must contain either direct or inferential allegations respecting all of the material elements to sustain a recovery under some viable legal theory. Id. at 944; Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988).

The Plaintiffs alleged:

> The class consists of all current and future Tennessee residents with developmental disabilities who are eligible for Medicaid services under the ICF/MR program or the Medicaid waiver program, but who have been denied entry into those programs. At present, 843 individuals from all areas of the state have been placed on waiting lists for the ICF/MR and Medicaid Waiver programs. It is estimated that 5,000 people will need these services over the next five years.

(Docket Entry No. 10, First Amended Complaint ¶ 13 (emphasis added)). The words "program" or "programs" are used four times in paragraph 13. The word "program" encompasses payment for

10

Medicaid services just as easily as it includes the services themselves. Plaintiffs further alleged in paragraph 15 that the question of law and fact common to the class was whether Defendants "illegally <u>deny access</u> to ICF/MR and/or Medicaid Waiver <u>services</u> to eligible individuals." (<u>Id.</u> ¶ 15 (emphasis added).) While in paragraph 15 Plaintiffs used the word "services" rather than "program" or "programs," the meaning is the same in this context. Plaintiffs alleged that Defendants denied them access to participation in Medicaid programs. Such access can be denied by the failure to provide financial assistance with reasonable promptness so that Plaintiffs may obtain necessary services from private providers. Rather than provide financial assistance with reasonable promptness, Defendants placed eligible persons on a "waiting list for the ICF/MR and Medicaid Waiver programs." Plaintiffs did not allege that Defendants failed to provide them with ICF/MR or Medicaid waiver services *directly*, which was the issue in <u>Westside Mothers II</u>.

That Plaintiffs were complaining about denial of access to financial assistance is confirmed by other allegations of the First Amended Complaint. In paragraph 18, Plaintiffs alleged that the Medicaid <u>program</u> "is a cooperative federal-state program to enable the states to furnish medical assistance to individuals who are unable <u>to meet the costs of necessary medical services. Costs of the program are shared by the federal and state governments.</u>" (<u>Id.</u> ¶ 18, emphasis added.) The Defendants admitted the allegations in paragraph 18 in their Answer to the First Amended Complaint. (Docket Entry No. 11, Answer ¶ 18.) Interpreting the term "medical assistance" used in this paragraph as "financial assistance to eligible individuals to enable them to obtain covered services," <u>Westside Mothers II</u>, 454 F.3d at 540, Plaintiffs and Defendants both clearly recognized that the Medicaid program enables the State of Tennessee to furnish financial assistance to eligible individuals to enable them to meet the costs of necessary, covered medical services.

11

Plaintiffs also correctly recognized in the First Amended Complaint that the State of Tennessee is not obligated to participate in the Medicaid program, but having chosen to participate, the State must operate its program in compliance with federal statutory and regulatory requirements, 42 U.S.C. § 1396a. (First Amended Complaint ¶ 19.) Defendants admitted this allegation as well. (Answer ¶ 19.) Further, Plaintiffs alleged that the Medicaid statutes provide "core services that are mandatory for any state participating in the Medicaid program[,]"; that states may choose to cover federally recognized optional services in addition to mandatory services; and that a state choosing to provide an optional service must follow the same statutory and regulatory requirements as apply to mandatory core services. (Id. ¶ 20.) Plaintiffs' use of the word "cover" was another way of referring to the State's payment for federally recognized optional services.

Plaintiffs also alleged in paragraph 20 that the requirements of federal law include the right of eligible individuals to apply for services, the right to notice and a fair hearing if an application is denied, the right to have services provided with reasonable promptness, and the right to services of adequate amount, duration, and scope. (Id.) In response, Defendants admitted they are subject to the requirements of the Medicaid Act, and they admitted the allegations of paragraph 20 to the extent the allegations are consistent with the requirements of Medicaid law. Defendants objected to Plaintiffs' use of the word "adequate," but Defendants admitted that "Medicaid requirements include the right to service sufficient in amount, duration and scope to reasonably achieve its purpose." (Answer ¶ 20.) The Sixth Circuit acknowledged all of these requirements of Medicaid law in Westside Mothers II. Plaintiffs alleged in paragraph 20 a "right to have *services* provided with reasonable promptness" and Defendants admitted in response that Medicaid requirements include the "right to service." In context with the prior allegations, Plaintiffs obviously meant, and

12

Defendants understood, that Plaintiffs had a right to financial assistance provided by the State through its Medicaid program with reasonable promptness so that Plaintiffs could obtain needed services from private providers. After all, it is well understood that "Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals." Bruggeman, 324 F.3d at 910.

Similarly, in paragraphs 21 through 25 of the First Amended Complaint, the Plaintiffs explained more fully the statutes providing for ICF/MR services and services under the HCBS waiver program. In doing so, Plaintiffs used common parlance like "[t]his section permits states to offer an array of home and community based services that an individual needs to avoid institutionalization[,]" "Tennessee provides services under the Home and Community-Based Waiver program[,]" "[w]hen a state provides services under a Waiver," and "[s]ervices available in Tennessee under the Waiver program include[.]" The clear meaning of these paragraphs is that, by participating in ICF/MR and Medicaid waiver programs with the federal government, the State of Tennessee agreed to "cover," as Plaintiffs used that term earlier, or pay for, a range of services as part of its Medicaid plan approved by CMS. The kinds of services covered are listed in paragraph 25. Nowhere in these five paragraphs did Plaintiffs allege that Defendants do provide, or should provide, such services directly to eligible individuals.

In fact, Defendants admitted the allegations of paragraphs 21 through 23 and 25. In response to paragraph 24 Defendants stated: "admit that when a state provides services under a waiver, the state must assure that individuals who are likely to require the level of care provided in an ICF/MR will be informed of any feasible alternatives available under the waiver and given the choice of either institutional or home and community-based services." (Answer ¶ 24 (emphasis added).) Like

13

Plaintiffs, Defendants in their Answer used the same shorthand method of describing the State's role in providing payment for Medicaid services as "providing services."

Plaintiffs further alleged that the State's ICF/MR facilities were closed to new admissions due to court orders, opportunity for ICF/MR placement was limited to attrition at existing private facilities due to a bed cap, and access to HCBS waiver services was also severely restricted. (First Amended Complaint ¶¶ 26-27.) Critically, Plaintiffs alleged:

> Defendant limits ICF/MR and Waiver services by denying eligible individuals and their families information about the pre-admission evaluation process and the right to appeal a denial of services. Eligible individuals and their parents are told that there is no funding for services and that they must be placed on a waiting list.

(Id. ¶ 28 (emphasis added.) There can be no doubt that Plaintiffs alleged they were denied information about the pre-admission evaluation process, they were denied the right to appeal an unfavorable decision, and eligible individuals were told there was no funding available and as a result they would be placed on a waiting list until such funding became available to them. Plaintiffs did not allege that they were placed on a waiting list to receive services directly from the State. In response to Plaintiffs' allegations, Defendants stated: "admit that some eligible individuals and their parents have been told that there is no funding for services and that they must be placed on a waiting list. Defendants deny the remaining allegations in paragraph 28." (Answer ¶ 28, emphasis added.)

Thus, the parties agreed that the waiting list was for persons awaiting payment for services, not the actual provision of services by the State. Such a waiting list for Medicaid payment satisfies Mandy R., 464 F.3d at 1143, for there, the Tenth Circuit acknowledged that placement on a waiting list for payment of services, rather than placement on a waiting list for the provision of services, would state a viable claim under § 1396a(a)(8).

14

Plaintiffs described the shortcomings in procedures adopted by the State to handle applications from eligible individuals for Medicaid funding, as well as the absence of data management systems for gathering complete information about eligible individuals and maintaining the data in usable forms. Plaintiffs claimed there were problems with identifying "the number of people waiting for Waiver services and questions regarding duplicate or unduplicated counts. (First Amended Complaint ¶¶ 29-30.) The Defendants admitted these allegations. (Answer ¶¶ 29-30.)

Plaintiffs further alleged that the waiting lists were "growing because of the state's failure to provide the ICF/MR or Waiver level services required by federal law[,]" and they provided statistics concerning the number of people on the waiting list and the expected growth of the waiting list. (First Amended Complaint ¶¶ 31-32.) The Plaintiffs demanded that the State expand its network of community-based services, which included private providers in centers and homes. Defendants admitted there had been some improvements made in the Medicaid program, but there were still problems with obtaining accurate data. (Answer ¶¶ 31-32.) Defendants also acknowledged the difficulty in attracting private providers in some communities with the proper equipment and trained staff.

By describing individuals as "waiting for Waiver services" or alleging that the waiting lists were growing because of the State's "failure to provide . . . services," Plaintiffs did not claim that only the State could or would provide ICF/MR or waiver services directly. Rather, when these paragraphs are read in conjunction with the preceding paragraph 28, Plaintiffs meant, and Defendants agreed, that individuals were waiting to receive services from a network of community-based private providers which was to be developed by the State and ultimately to be paid by the Tennessee Medicaid program. Plaintiffs alleged that by delaying Plaintiffs' applications, evaluations

15

for eligibility, and enrollment into the Medicaid program and putting them on a waiting list instead, the State was failing to provide financial assistance to them with reasonable promptness in violation of federal law.

The specific counts of the First Amended Complaint must be understood in light of the foregoing allegations. Plaintiffs alleged in Count I that "Defendant's failure to provide ICF/MR and Waiver services in an adequate amount, duration, and scope violates 42 U.S.C. § 1396a(a)(10) and implementing regulations." (Id. ¶ 40.) In Count II, Plaintiffs alleged that "Defendant's failure to provide eligible individuals a choice between an ICF/MR and Waiver services violates 42 U.S.C. § 1396(n)(c)(2) and implementing regulations." (Id. ¶ 41.) In Count III, Plaintiffs alleged that "Defendant's failure to advise ICF/MR and Waiver applicants of the pre-admission evaluation process denies these applicants the opportunity to apply for medical assistance in violation of 42 U.S.C. § 1396a(a)(8). (Id. ¶ 44.) In Count IV, Plaintiffs alleged that "Defendant's failure to serve plaintiffs with reasonable promptness violates 42 U.S.C. § 1396a(a)(8) and implementing regulations." (Id. ¶ 46.) Finally, in Count V, Plaintiffs alleged that "Defendant's failure to provide written notices and an opportunity to be heard when ICF/MR or Waiver services are denied or not provided with reasonable promptness violates 42 U.S.C. § 1396a(a)(3) and implementing regulations, as well as the Due Process Clause of the United States Constitution." (Id. ¶ 48.)

Not one of the five specific Counts in the First Amended Complaint includes the phrase "waiting list." Nowhere in the First Amended Complaint did the Plaintiffs allege that Defendants had a duty under federal law to provide services directly to the Plaintiffs, a duty the Sixth Circuit held to be nonexistent in Westside Mothers II, 454 F.3d at 539-540 ("the issue presented . . . is

16

whether the individual rights to 'medical assistance' created by these provisions impose[] an obligation on the State to provide services directly.")

The Court concludes that Plaintiffs' use of shorthand phrases in the First Amended Complaint such as "the right to have services provided with reasonable promptness" instead of "the right to have financial assistance provided with reasonable promptness" (which nine years after pleading the First Amended Complaint appears to be the more appropriate phraseology in light of Westside Mothers II) amounts to a distinction without a difference. Defendants obviously understood the pleading and used the same or similar language. Defendants were on fair notice from the allegations of the First Amended Complaint that what Plaintiffs primarily alleged was denial of prompt evaluation of their applications for Medicaid financial assistance, failure to provide payment for necessary Medicaid services with reasonable promptness, failure to provide a means of appeal from a denied application, and failure to gather and utilize information about eligible individuals, all of which had the result of denying Plaintiffs access to Medicaid funding for needed services covered under the State's Medicaid Plan approved by CMS. See Fed.R.Civ.P. 8(a)(2) ("short and plain statement of the claim" rule).

On May 7, 2003, this Court denied the parties' cross-motions for summary judgment on all five Counts of the First Amended Complaint. (Docket Entry Nos. 102 & 103, Memorandum and Order.) The Court held in a twenty-five page opinion that each of the five Counts stated a viable claim and that genuine issues of material fact existed to preclude summary judgment for either side. The Sixth Circuit was not asked to decide whether the Court erroneously denied the cross-motions for summary judgment because thereafter the parties decided to settle the case to avoid a trial on the merits and subsequent appeal.

17

### 4.  The terms of the Settlement Agreement approved by the Court

The Settlement Agreement executed by the parties uses the same shorthand language that the parties used in their pleadings.  Section 1. <u>Scope of Settlement</u> provides in part:

> The plaintiffs filed this action . . . asserting violations of Medicaid law by defendants' alleged failure to provide Medicaid services with reasonable promptness to eligible individuals with mental retardation.  A class has been certified in this matter to include:
>
>> Tennessee residents with mental retardation who are eligible for Medicaid services under the ICF/MR program pursuant to 42 U.S.C. § 1396a or a Home and Community Based Services waiver for the Mentally Retarded and Developmentally Disabled pursuant to 42 U.S.C. § 1396n, who request services under these programs but (1) are denied the opportunity to apply for such services; (2) whose application for services under these programs is denied; or (3) are placed on a DMRS waiting list for services under these programs.

(Docket Entry No. 116, Agreed Order, Ex. A Settlement Agreement.)  The Settlement Agreement specifically defined "Waiting List" to refer "to the list maintained by the Division of Mental Retardation Services (DMRS) that includes <u>individuals determined to be eligible for and seeking services</u> under the ICF/MR program pursuant to 42 U.S.C. § 1396a or a Home and Community Based Services waiver for the Mentally Retarded and Developmentally Disabled pursuant to 42 U.S.C. § 1396n."  (Settlement Agreement at 4 (emphasis added).  The "Waiting List" included names of "individuals determined to be eligible for and seeking services[.]" Since Medicaid is a payment scheme, it is rational to understand the parties' definition as referring to a waiting list to receive payment for services.

The Sixth Circuit stated expressly in <u>Westside Mothers II</u>  that the "most reasonable interpretation of § 1396a(a)(8) is that all eligible individuals should have the opportunity to apply for medical assistance, i.e. financial assistance, and that such medical assistance, i.e. financial

assistance, shall be provided to the individual with reasonable promptness." Westside Mothers II, 454 F.3d at 540. Consistent with these principles, the parties and the Court understood at the close of the pleadings, at the time the class was certified, at the time the cross-motions for summary judgment were denied, and at the time the Settlement Agreement was approved that eligible individuals with mental retardation could request and receive services under Tennessee's Medicaid ICF/MR or waiver programs only if the Defendants made available to them Medicaid financial assistance to pay for such services. The community-based services are primarily offered by private providers, not the Defendants. However, services offered by private providers would not exist without the State's involvement. The State was expected to develop a network of community-based mental health facilities and providers, and the State would contract with those facilities and providers to pay for services under Medicaid. Plaintiffs and Defendants understood that the private providers would not build, equip, and staff such facilities without direct involvement of the State. Neither the individuals in need of services or their family members could persuade private providers to invest money for construction, equipment and staff without the State's supervision and involvement. There was no understanding on the part of the parties or the Court that Plaintiffs expected the State to provide services directly to Plaintiffs under the waiver program, unless particular Plaintiffs chose to receive care in a state-owned Intermediate Care Facility. The definitions of the certified class and the term "Waiting List" as stated in the Settlement Agreement are thus clearly proper under Westside Mothers II and Mandy R.

In Section II, Preamble and Guiding Principles, the parties recognized their common interests and goals in improving the Medicaid delivery system for eligible persons with mental retardation and they acknowledged that individuals "have been placed on waiting lists for mental retardation

19

services." (Settlement Agreement at 2.) Again, there is no mention that Plaintiffs expected the Defendants to provide services directly, unless particular Plaintiffs chose to receive care in a state-owned facility. Rather, in light of the pleadings and all of the prior proceedings in the case, it is apparent that both sides intended to make efforts to improve the Medicaid delivery system and bring it into compliance with federal law so that the applications of eligible mentally-retarded persons for Medicaid financial assistance would be reviewed and decided more promptly, and Medicaid funding would be made available more quickly for eligible persons to obtain needed services from private providers. The parties expected this would have the concomitant effect of substantially reducing or eliminating the waiting list during the life of the Settlement Agreement.

The parties stated:

This Agreement is intended to eliminate or substantially reduce the waiting list for services by providing for: (1) the development of the mental retardation system infrastructure and provider network capacity necessary to support the expansion of quality home and community based waiver services; (2) access to interim services for Medicaid-eligible individuals seeking services; and (3) an appropriate planning process for the future expansion and/or development of home and community based waiver programs and services for Medicaid-eligible persons with mental retardation on the DMRS waiting list. While defendants cannot fully anticipate the rate of growth of the DMRS waiting list, the amount of legislative appropriations for home and community based MR services, or the maximum number of waiver participants that will be approved by the Centers for Medicare and Medicaid Services (CMS), the goal is to eliminate or substantially reduce the waiting list for services for Medicaid-eligible persons with mental retardation that meet the ICF/MR level of care criteria. The defendants' commitment is to: 1) work toward lifting the moratorium on new admissions to the existing home and community based MR waiver program as soon as possible; 2) develop MR service system infrastructure; 3) apply for new waivers so that the DMRS waiting list will move at a reasonable pace; and 4) strive to provide services to Medicaid-eligible persons with mental retardation that meet the ICF/MR level of care criteria on the waiting list with reasonable promptness. It is defendants' intent to reach the goals of this Agreement without reducing the funding for other services to individuals with mental retardation.

(Settlement Agreement at 2-3.)  Nowhere in the Preamble did the parties indicate their intent that the State would provide Medicaid services to the Plaintiff class directly, other than in a state-run facility; rather, the State was to provide services indirectly through the development of community-based private providers.  All of these goals were consistent with the parties' understanding that the State had a duty to provide financial assistance under the Medicaid program, without which the persons on the waiting list for payment could not obtain services from private providers.

Defendants agreed in Section IV to expand the Medicaid Waiver Program by (a) seeking a new Medicaid Self-determination Waiver program; (b) providing funding for, enrolling, and beginning the provision of services for 600 enrollees in the Self-determination Waiver program; (c) continuing to enroll eligible individuals into the HCBS waiver with $12 million in improvement funding annually for fiscal years 2003-2004, 2004-2005, and 2005-2006; (d) within six months after approval of the Settlement Agreement, developing a method and process to define how individuals may move from the Self-determination Waiver to the existing HCBS waiver; and (e) providing a limited amount of short-term crisis and/or one-time diversion funds that could be used to provide temporary additional services beyond the $30,000 cap per person per year of the Self-determination Waiver. (Settlement Agreement at 5-8.)

Defendants agreed in Section V that (a) to the extent there existed an available waiver slot and funding for that slot, eligible individuals would be enrolled in the waiver with reasonable promptness; (b) they would identify, notify, and enroll persons in the 600 slots for the Self-determination Waiver in year 1; and (c) they would identify, notify, and immediately enroll persons, particularly those in crisis, in the HCBS waiver in accordance with its provisions with reasonable promptness.  The parties defined "reasonable promptness" for those classified as "in crisis" as

21

"services will be initiated within 30 days of the letter of notification to eligible persons choosing to be enrolled in the Waiver."  Further, should the CMS moratorium be lifted so that individuals in the "urgent" or "active" categories could be enrolled, "reasonable promptness" was defined as "services will be initiated within 90 days of the letter of notification to eligible persons choosing to be enrolled in the funded slot of the Waiver."  (Settlement Agreement at 8-10.)

In Section VI, Defendants agreed to make program improvements, including (a) an independent agency assessment of those persons on the waiting list; (b) implementation of a targeted case management program to be available to all Medicaid-eligible individuals on the waiting list; (c) provision of consumer directed support to each individual on the waiting list in the crisis, urgent or active category but not receiving family support services, capped at no more than a total of $5million per year; (d) additional interim services if the Defendants failed to obtain CMS approval for the new Self-determination Waiver; and (e) implementation of measures to address community infrastructure needs.  (Settlement Agreement at 11-12.)  The Settlement Agreement also included provisions on long range planning (Section VII), the application process (Section VIII), monitoring and enforcement (Section IX), attorney's fees, expenses and costs (Section X), miscellaneous provisions (Section XI), and the term of the Agreement (Section XII).  All of the provisions were aimed toward oiling the gears of the State's Medicaid payment and management mechanisms.  This was done  so that the State would actually provide the financial assistance it agreed to provide when it opted to participate in the Medicaid program, rather than simply placing eligible people on a waiting list for months and years.

*5. This Court's decision denying Defendants' Motion to Vacate and to Dismiss*

In the decision rejecting Defendants' arguments for dismissal and denying the Motion to Vacate, the Court held that the Agreement was a jointly executed, binding contract reached in settlement of litigation which placed

> a specific duty on Defendants to ensure the provision of needed services, even though Defendants were not required by the Agreement itself or now by <u>Westside Mothers II</u> to provide such services themselves. . . .Defendants agreed to improve funding for, and delivery of, needed services. <u>Id.</u> at 5-15. There are no provisions in the Agreement obligating the Defendants to provide medical services directly or making the State a "provider of last resort."

<u>Brown</u>, 2007 WL 2710704 at *6. The State was obligated to develop the private provider network and pay those providers for services needed by mentally retarded individuals. The Court further held that the "parties did not make a mutual mistake of law that would justify terminating this Agreement, nor has the law changed to such an extent that all of the provisions of the Agreement now impose a higher burden on the state Defendants than federal law requires." <u>Id.</u> at *7. The Court determined that, "[i]n settling the underlying litigation, Defendants willingly accepted a contractual duty to help accomplish the parties' 'overriding common interest' in 'assuring that Tennessee's citizens with mental retardation are provided reasonable opportunities to grow and develop, exercise independence, and lead full and productive lives in a safe environment.' (Agreement at 2.)" <u>Id.</u>

Importantly, in footnote 5 of the opinion, this Court observed that, under federal statute, states must

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist

23

enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]

Id. at *7 n.5 (quoting 42 U.S.C. § 1396a(a)(30)).  The Court went on to say that, although the Sixth Circuit held in Westside Mothers II that § 1396a(a)(30) does not confer on Medicaid recipients a private right of action under §1983,

> the statute prescribes the law the states must follow to ensure that enough service providers are available, and the Defendants accepted their responsibility to follow this law and improve the Tennessee provider network when they executed the Agreement.  See also 42 U.S.C. § 1396a(a)(9) (requiring states to establish and maintain health standards for private and public institutions in which recipients of medical assistance receive care or services; 42 U.S.C. § 1396n(c)(2) (requiring states to assure necessary safeguards to protect health and welfare of individuals provided services under HCBS waiver and to assure financial accountability for funds expended with respect to such services).  The federal government retains authority to withhold payment of federal Medicaid funds to any state that changes its plan to such a degree that it no longer complies with the provisions of § 1396a or in the administration of the plan there is a failure to comply substantially with any provision of § 1396a.

Id.

To repeat, this Court held that, by executing the Settlement Agreement, the Defendants recognized and reaffirmed their obligations under federal statutory law to: (1)  provide payment for mental retardation services in private and State ICF/MR facilities and for HCBS waiver services that the State agreed to include in its Medicaid plan; (2) adopt methods and procedures so that the care and services available under the State's Medicaid plan are used only by those who need the care or services; (3) assure that payments for care and services are consistent with efficiency, economy and quality of care; (4)  assure that payments are sufficient to enlist enough providers so that care and services are available under the plan; (5) establish and maintain health standards for private and public institutions in which recipients of medical assistance payments receive care or services; and

24

(6) assure necessary safeguards to protect the health and welfare of individuals who are provided services under the HCBS waiver.

In short, the State's responsibility under the Medicaid Act does not start and stop with the act of writing checks to pay for Medicaid services provided by private entities. See Wilder v. Virginia Hosp. Assoc., 496 U.S. 498, 502 (1990) ("Although participation in the program is voluntary, participating states must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services."); Long Term Care Pharmacy Alliance v. Ferguson, 362 F.3d 362 F.3d 50, 57 (1st Cir. 2004) (noting that § 1396a(a)(30) focuses on the state as "the person regulated" rather than on the individuals protected).

The federal Medicaid statutes and regulations spell out in lengthy detail the responsibilities and obligations the State assumes when it agrees, as part of its Medicaid plan, to spend state funds to pay for private ICF/MR and HCBS waiver services in return for federal financial assistance, even though the State itself does not provide the actual medical services. See Westside Mothers v. Haveman, 289 F.3d 852, 858 (6th Cir. 2002) ("Westside Mothers I") (quoting Bennett v. Kentucky Dept. of Educ., 470 U.S. 656, 669 (1985) for proposition that federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy and "the conditions imposed by the federal government pursuant to statute upon states participating in Medicaid and similar programs are not merely contract provisions; they are federal laws.") Indeed, the Medicaid statutes and regulations are the supreme law of the land and supersede any conflicting state laws. Id. at 860. Thus, the Sixth Circuit held in Westside Mothers I that the putative plaintiffs, children who were eligible for screening and treatment services under 42 U.S.C. § 1396a(a)(8) and (a)(10), possessed a legal cause of action for alleged noncompliance with the

25

statutory screening and treatment provisions of the Medicaid Act because the "provisions set a binding obligation" on the state and "are couched in mandatory rather than precatory language, stating that Medicaid services '*shall* be furnished' to eligible children, 42 U.S.C. § 1396a(a)(8) (emphasis added), and that the screening and treatment provisions '*must* be provided,' id., § 1396a(a)(10)(A), see also 42 C.F.R. § 441.56 (mandatory language)." Id. at 863.

The State's recognition and acceptance of its obligations under federal law, including through the Settlement Agreement, has been confirmed repeatedly by Stephen Norris, Deputy Commissioner, Division of Mental Retardation Services, in his deposition testimony. As one example, the Court notes that, in denying Plaintiffs' motion for specific performance, the Court stated:

> Because so many DMRS resources were devoted to getting the moratorium lifted[2] and achieving approval of the new [Self-Determination] waiver, Commissioner Norris acknowledges that achieving growth in the provider network was not a top priority. However, Defendants took other important and preliminary steps to improve the provider network, such as severing ties with providers giving substandard services, writing a provider manual to set service definitions, rewriting the rate structure so that the system is more predictable for providers, and clarifying the role of support coordination agencies. With these critical improvements well underway, Commissioner Norris admits that Defendants are "not very far" in developing the provider network, but he agrees that the work must be done, (Docket Entry No. 219-3 at 24-26, 29, Norris Depo.) and believes that Defendants can devote more resources to encouraging growth in the provider network. (Docket Entry No. 219-2 at 7-13.) He harbors serious doubt that the provider network capacity can grow to the extent necessary to eliminate the waiting list by year five, but he does think the waiting list can be reduced significantly. (Id. at 3, 17-18; Docket Entry No. 219-3 at 32, 38, 46, 50, 52.)

Brown, 2008 WL 2704362 at *13. There are many other examples that the Court could draw from the voluminous evidentiary record. Suffice it to say, until the Sixth Circuit decided Westside

---

[2]In May 2001, the Federal Center for Medicare and Medicaid Services ("CMS") imposed a moratorium on the enrollment of individuals under the State's HCBS waiver due to extensive problems with the State's management of the program.

<u>Mothers II</u> and the Tenth Circuit decided <u>Mandy R.</u>, Defendants expressed no confusion about the obligations placed on them by various federal Medicaid statutes and regulations as reaffirmed in the Settlement Agreement itself. Many of the statutory and regulatory provisions which govern the State's Medicaid program were not even discussed in <u>Westside Mothers II</u> or <u>Mandy R.</u>

      *6. The Sixth Circuit's reversal in part of the Court's decision*

      In reviewing this Court's decision denying Defendants' Motion to Vacate, the Sixth Circuit concluded that the Court misapplied <u>Rufo</u> because the Court denied Defendants' motion on the ground that their obligations under the settlement were contractual and unaffected by <u>Westside Mothers II</u>. <u>Brown</u>, 561 F.3d at 546. The court said "[w]hat matters under <u>Rufo</u> is not that Tennessee agreed to take the actions specified in the settlement, but what those actions were intended to remedy: if the settlement was premised on the understanding that the Medicaid statute imposed upon Tennessee a duty to ensure the provision of medical services, then <u>Rufo</u> counsels that we vacate the agreed order because <u>Westside Mothers II</u> established that no such duty exists." <u>Id.</u> The appellate court, however, did not vacate the Agreement under <u>Rufo</u> because it was "not convinced that the dramatic relief Tennessee seeks–for us to vacate the settlement in its entirety–is appropriate at this juncture." <u>Id.</u> at 547.

      The Sixth Circuit did not grant Defendants' Motion to Vacate and Dismiss outright because the parties characterized "the underlying litigation and goals of the settlement in very different ways," and it was not clear to the court "from the sparse record whether <u>Westside Mothers II</u> completely undermined the settlement." <u>Id.</u> Defendants argued that "the settlement was intended to eliminate its waiting list for Medicaid services based upon a perceived statutory duty to ensure that services were provided to all eligible individuals." <u>Id.</u> at 547. Plaintiffs, however, disavowed

that characterization and instead contended "that they were seeking information about the waiver program, access to it, and enrollment in available slots (at least up to the statutory cap) so that they could obtain Medicaid funds." Id.  The record did not conclusively show which party's description of the underlying litigation was correct, and the court stated that Plaintiffs' "complaint is pleaded generally and could plausibly be read to support either theory." Id.  The appellate court believed the "basis and meaning of the decree are not clear, and the district court has yet to interpret it." Id.  Thus, the appellate court hesitated to vacate the decree in its entirety.  The panel stated, however, that if "plaintiffs' account of the underlying litigation is as revisionist as Tennessee claims, then Tennessee is entitled to full relief from prospective enforcement.  But the district court will have to address this matter on remand." Id.

The court also considered that the Settlement Agreement is set to expire at the end of this year, and "given that only part of the settlement is in clear conflict with Westside Mothers II, and that Tennessee's obligations will soon end, we do not believe that equity necessarily requires that we vacate the decree in its entirety now." Id.

The court also pointed out that Defendants may be able to obtain relief from the Agreement on the ground that the duty to enroll additional individuals into the waiver program is conditioned on both the availability of a waiver slot and funding for that slot, and also, under the Agreement, after the first two years, Defendants may defend any action for non-compliance on the ground that they are in compliance with the federal laws.  The court stated that "Tennessee is currently defending a pending enforcement action on this very ground[,]" presumably referring to the pending motions for summary judgment on long-range planning for years three through five of the

28

Agreement, id. at 547-548, although this Court does not characterize the issue concerning years three through five as an "enforcement action."

Nonetheless, the Sixth Circuit panel did vacate two aspects of the Agreement:

> First, we vacate Tennessee's commitment to develop "provider network capacity," . . . which does not appear to remedy any violation of federal law after Westside Mothers II. Second, any commitment Tennessee arguably made to eliminate the waiting list for services is likewise unenforceable after Westside Mothers II. Absent more, a waiting list for waiver services is not inconsistent with Tennessee's duty to provide "medical assistance" to individuals eligible for its HCBS waiver with "reasonable promptness."

Id. at 548. The panel concluded: "On remand, the district court should consider the agreed order in light of its knowledge of the history of this case and our discussion of Westside Mothers II and Mandy R. to determine whether and to what extent the settlement should be enforced during its final nine months of existence." Id.

*7. Reevaluation of the Motion to Vacate After Remand*

On remand, the Court has now followed the directions given by the Sixth Circuit. The Court has considered the Agreed Order and the Settlement Agreement in light of the Court's knowledge of the history of the case and the Sixth Circuit's discussion of Westside Mothers II and Mandy R. As a result of this review, the Court determines that the Settlement Agreement remains enforceable during its final months of existence, with the exception of the two aspects discussed in the Sixth Circuit Brown opinion and as explained below upon consideration of the parties' cross-motions for summary judgment on years three through five.

The Sixth Circuit vacated "Tennessee's commitment to develop 'provider network capacity,' . . . which does not appear to remedy any violation of federal law after Westside Mothers II." 454 F.3d at 548. Although the Court is not in full agreement with this directive in light of 42 U.S.C.

§ 1396a(a)(30), as discussed in footnote 5 of the Court's prior opinion, <u>Brown</u>, 2007 WL 2710704 at *7 n.5; Docket Entry No. 199 at 11-12, the Court is bound to follow the Sixth Circuit's decision on this point. The appellate court has now held that, because § 1396a(a)(30) does not confer on Medicaid recipients a private right of action under § 1983, <u>Westside Mothers II</u>, 454 F.3d at 541, there is no legal right to remedy, and therefore, the Defendants are not bound by the Settlement Agreement's terms addressing Defendants' commitment to develop provider network capacity. Any provisions of the Settlement Agreement addressing Defendants' commitment to develop provider network capacity are no longer enforceable.

It is some comfort that Defendants have accomplished much since the Settlement Agreement was approved in 2004 to improve and develop provider network capacity. Defendants repeatedly mentioned with pride in court filings and testimony of state officials before the Court all of the improvements that have been achieved in this area as a result of this lawsuit. Although the Settlement Agreement no longer exerts any control over Defendants' conduct in developing provider network capacity, Defendants nonetheless remain subject to the constraints of § 1396a(a)(30) in their dealings with CMS, which oversees and regulates Tennessee's Medicaid Plan.

The Sixth Circuit also vacated "any commitment Tennessee arguably made to eliminate the waiting list for services[.]" To the extent the Settlement Agreement can be said to include a commitment by Defendants to eliminate the waiting list for services, such a commitment now falls by the wayside. But as the Court has shown in the prior pages of this opinion, Defendants did not make a commitment to eliminate a waiting list for services that the State would provide directly, which was the issue in <u>Westside Mothers II</u>. Here, Defendants made a commitment to substantially reduce or eliminate a waiting list for enrollment in the Medicaid program for payment of financial

30

assistance for services provided by others, and to this extent, the Settlement Agreement shall remain in full force and effect until its expiration.

The Sixth Circuit stated in <u>Brown</u>, 561 F.3d at 547, that "[i]f plaintiffs' account of the underlying litigation is as revisionist as Tennessee claims, then Tennessee is entitled to full relief from prospective enforcement." Having reviewed the entire litigation of the case, however, the Court finds that the Defendants hold the revisionist view of the litigation, not the Plaintiffs. According to the <u>Brown</u> opinion, the Defendants argued to the Sixth Circuit that the Settlement Agreement "was intended to eliminate its waiting list for Medicaid services based upon a perceived statutory duty to ensure that services were provided to all eligible individuals." <u>Id.</u> As shown above, if this was indeed Defendants' posture on appeal, it was not the position Defendants took in their Answer to the First Amended Complaint or in the proceedings leading up to the motion to vacate or dismiss. The <u>Brown</u> opinion also stated: "Plaintiffs, however, disavow this characterization of the underlying litigation. Instead, they contend that they were seeking information about the waiver program, access to it, and enrollment in available slots (at least up to the statutory cap) so that they could obtain Medicaid funds." <u>Id.</u>

As the Court's review demonstrates, the Plaintiffs' argument to the Sixth Circuit was a faithful description of the litigation as it unfolded in this Court. It was the Defendants who seized upon what is, in the Court's view, an artificial distinction drawn in <u>Mandy R.</u> between pleading a "waiting list for services" and a "waiting list for payment of services." Defendants zealously latched onto this unfortunate distinction made in <u>Mandy R.</u> to support their effort to relieve themselves of the obligations imposed by the Settlement Agreement. The Court believes that the Defendants have always known and acted as if what the Medicaid program requires is that the State make funds

31

available on behalf of eligible mentally retarded individuals enrolled in the Medicaid program to pay for services those individuals obtain from private providers.

Accordingly, Defendants' Motion To Vacate the Agreed Order Approving the Settlement Agreement and to Dismiss the Case (Docket Entry No. 155) will be granted only to the extent that Defendants need no longer honor their commitment to develop "provider network capacity" or any commitment they arguably made to eliminate the waiting list for services, as directed by the Sixth Circuit. The motion will be denied in all other respects.

## C. Cross-Motions for Summary Judgment

As stated earlier, the pending summary judgment motions concern the number of eligible individuals on the waiting list who should be enrolled in the Medicaid program during years three through five of the Settlement Agreement.[3] Because of various delays caused by litigation, this is now year five, with the Settlement Agreement set to expire on December 31, 2009. It is undisputed that the waiting list has continued to grow during the years covered by the Settlement Agreement despite increased funding by the Tennessee General Assembly in the first two years of the Agreement and the enrollment of hundreds of individuals from the waiting list into the waiver programs starting in 2004. (Docket Entry No. 272.)

The Sixth Circuit noted in the Brown opinion that "we do not take the plaintiffs to contend that Tennessee has a[n] unlimited duty to enroll eligible individuals in its HCBS waiver. To the extent that is plaintiffs' position, we reject it now." Brown, 561 F.3d at 548 n.4. The appellate court went on to say that "[w]e express no opinion as to whether Tennessee has a duty to enroll eligible

---

[3]To the extent Defendants contend they are entitled to summary judgment because the Agreed Order approving the Settlement Agreement should be vacated, the motion for summary judgment is denied for the same reasons the motion to vacate or dismiss is denied in most respects.

individuals up to the waiver-enrollment cap or whether such a duty was contemplated by the settlement agreement at issue in this case." Id.

Plaintiffs did initially contend in their pending motion for summary judgment that Defendants should be required "to fulfill the Settlement Agreement by enrolling the number of persons per month necessary to result in the substantial reduction or elimination of the waiting list given the number of months remaining before December 31, 2009[.]" (Docket Entry No. 270, Memorandum at 13.) After the Sixth Circuit entered the Brown decision, however, Plaintiffs narrowed their request for relief and asked that the Court order Defendants "to comply with the Settlement Agreement by enrolling each month a sufficient number of people from the waiting list to fill all currently available waiver slots by no later than the Settlement Agreement's expiration on December 31, 2009."[4] (Docket Entry No. 290, Plaintiffs' Supplemental Brief at 1-2.)

The Medicaid Act authorizing the MR waivers states that waiver programs may "contain[] a limit on the number of individuals who shall receive home or community-based services." 42 U.S.C. § 1396n(c)(9). This is subject only to the statutory proviso that CMS "shall not limit to fewer than 200 the number of individuals in the State who may receive home and community-based services under a waiver under this subsection." 42 U.S.C. § 1396n(c)(10); 42 C.F.R. § 441.303(f)(6) (requiring states to indicate the enrollment limit for its waiver program). The State and CMS have agreed on a specific number of waiver slots, and the State has tied the number of slots authorized by CMS to the availability of legislative appropriations.

_____

[4]Plaintiffs appear to have dropped their alternative request that the Court extend the settlement period by at least thirty-six (36) months from the date of this Court's Order on the instant motions. Any such request would have to be made in accordance with Section XII B. of the Settlement Agreement and show substantive noncompliance in the Defendants' implementation of the Agreement.

33

As Defendants point out, in addition to the limit or cap on the number of waiver slots, their ability to enroll additional individuals into the MR waivers is controlled by two factors: (1) the capacity of the system for MR services to incorporate additional enrollees while still maintaining the necessary quality of services and (2) the financial resources the State can devote to MR services given the many competing demands for State dollars. (Docket Entry No. 170, Norris Decl ¶¶ 13-14; Docket Entry No. 265-1, Goetz Decl. ¶¶ 2-5.) The parties recognized in the Preamble and Guiding Principles section of the Settlement Agreement that Defendants "cannot fully anticipate the rate of growth of the DMRS waiting list, the amount of legislative appropriations for home and community based MR services, or the maximum number of waiver participants that will be approved by the Centers for Medicare and Medicaid Services (CMS)[.]" (Settlement Agreement at 3.) The parties agreed that, "within the limits of the federally approved waivers, to the extent that there exists an available waiver slot and funding for that slot, eligible individuals should be enrolled in the Waiver with reasonable promptness." (Id. at 9 (emphasis added).)

Tennessee Department of Finance and Administration Commissioner, Dave Goetz, attested that the State of Tennessee is experiencing very significant budget shortfalls as a result of the weakening national economy in 2008 and 2009, resulting in substantial budget cuts across state government. (Goetz Decl. ¶¶ 2-3.) Prior to November 1, 2008, DMRS continued to approve fifty (50) persons with mental retardation per month for enrollment into Medicaid waiver services, consistent with the Budget Document and approved Appropriations Act for the current fiscal year. (Id. ¶ 4.) Effective November 1, 2008, DMRS has been required to restrict intake into Medicaid waiver services to only those persons with mental retardation who are in an emergency situation, persons who are in transition from one of the State's developmental centers, young adults who are

34

too old for the Department of Children's Services' foster care, and persons who are scheduled to transition from mental health facilities and nursing homes. (Id.) Commissioner Goetz avers that the reduction in new enrollments into Medicaid waiver services is required due to the State of Tennessee's fiscal condition. (Id. ¶ 5.) Based on the current economic crisis, it does not appear that the State will have sufficient revenues next fiscal year to maintain the current rate of growth in enrollments, and to the contrary, DMRS has been directed to take steps to reduce the budget for next fiscal year. (Id.)

Commissioner Goetz further attests that DMRS has already taken steps to reduce personnel and expenditures, including a reduction in the rates for payments to providers. Unless further steps are taken to limit enrollments, DMRS will be forced to further reduce the rates for payments to providers. This could result in providers refusing to provide services at a risk to the health and safety of current service recipients. Therefore, DMRS is focusing its limited available resources on meeting the needs of individuals with the most urgent need for immediate service. (Id.)

Plaintiffs' response to this testimony is to argue that "the financial resources the State can devote to enrollment of individuals from the waiting list into the Medicaid Waiver program are the result of choices made by the State during the budgeting process, not a result of the State devoting all of its financial resources to fund services for individuals already enrolled in that program or other programs and simply running out of money." (Docket Entry No. 281, Plaintiffs' Response to Concise Statement of Material Facts In Support of Defendants' Motion For Summary Judgment ¶ 1.) Plaintiffs also contend that "the State has chosen to set aside hundreds of millions of dollars in rainy day funds and reserve accounts instead of using those funds to fulfill its agreement to enroll individuals from the waiting list into the Medicaid Waiver program." (Id.) Plaintiffs provide a

35

November 11, 2008 newspaper article from Tennessean.com in which Governor Bredesen discusses the magnitude of the budget shortfall, the need "to take some very painful action," and the expectation of the administration to "use some of the rainy-day fund to cushion the state's shortfall." (Docket Entry No. 280-3.)  The Governor is quoted in the article as saying that he wants to be conservative in using $750 million in rainy-day funds and other reserve accounts because "[y]ou can't just make the problem go away with the reserves–you could just run through them in a year and you'd have nothing left."  (Id.)

As presented, the newspaper article is inadmissible hearsay.  Further, Plaintiffs are simply contending that state officials are making public policy decisions about budgetary allocations and priorities with which they disagree.  But this is not sufficient to survive a summary judgment motion.  To gain a trial, Plaintiffs must produce evidence to generate a genuine issue of material fact by showing that Medicaid funding exists to permit additional enrollment of eligible persons with mental retardation into all available waiver slots despite Defendants' evidence that such funding does not exist and that state officials are making drastic cuts in the DMRS budget.  However, Plaintiffs have not produced any such evidence and likely cannot.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

Having reviewed the legal memoranda and documents filed in support of the parties' cross-motions for summary judgment, the Court concludes that, within the limits or caps set for the federally approved waivers, to the extent there exist available waiver slots and funding for those slots, the Settlement Agreement requires the Defendants to enroll eligible individuals into those available slots with reasonable promptness before the Settlement Agreement expires on December 31, 2009.  The Settlement Agreement does not give this Court any authority to order the

36

Defendants to undertake more than the Medicaid Act requires or budgetary funding allows. Accordingly, Defendants' motion for summary judgment will be granted and Plaintiffs' motion for summary judgment will be denied.

In conclusion, Westside Mothers II did not completely undermine the Settlement Agreement in this case. The extensive history shows that the intent of the parties was to speed enrollments in the Medicaid program so that eligible persons with mental retardation could receive Medicaid funding to pay private providers for needed services. Defendants' motion to vacate the Agreed Order and to dismiss will be granted only as necessary to modify the Settlement Agreement in accordance with the Sixth Circuit's recent decision. As to years three through five of the Agreement, summary judgment will be entered for Defendants. Enrollments in Medicaid waiver programs until December 31, 2009, are limited to available waiver slots and available funding for those slots.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE